No. 33,236

Unas Allen, *Appellee,* v. The Shell Petroleum Corporation, *Appellant.*

(68 P. 2d 651)

Opinion filed June 12, 1937.

*Albert Faulconer, Kirke W. Dale* and *C. L. Swarts,* all of Arkansas City, *Joe T. Dickerson, George W. Cunningham* and *W. D. Simms,* all of Tulsa, Okla., for the appellant.

*E. M. Knight,* of Arkansas City, for the appellee.

The opinion of the court was delivered by

Wedell, J.: This action was brought as an ordinary action for damages by an employee against his employer, the Shell Petroleum Corporation, and two of its foremen. The action was based on the alleged negligence of defendants. Plaintiff prevailed, and the defendant, Shell Petroleum Corporation, appeals. Demurrers of the foremen to plaintiff's petition were sustained. We are therefore concerned only with the judgment against the principal defendant.

The petition in substance alleged: Defendant operated an oil refinery at Arkansas City; plaintiff commenced work for it in October, 1928, as a laborer digging ditches, and so worked for about four months; he was then employed as a pipe fitter's helper until July, 1935, except for a six months' period in 1930 and 1931, when he was laid off by reason of a reduction of employees; he worked under instructions of a foreman and assistant foreman, in, on and about various stills, tanks, chambers, pipes and pipe lines, cleaning out and filling the aforesaid receptacles with oil, gas and petroleum

products, laying and coupling pipe lines, installing valves, tightening
joints and all other work necessary and incidental thereto as di-
rected; in the manufacture of oil, gasoline and other lubricants, a
large quantity of highly poisonous and injurious gases, fumes and
odors were expelled therefrom, which were permitted and allowed
to escape into the air where plaintiff was required to work; on
numerous occasions equipment at the refinery was under high pres-
sure and heated while plaintiff was required to work thereon, and
was constantly giving off vapors, fumes, odors and gases; these were
inhaled gradually over a long period of time; they also enveloped
and saturated his clothing, penetrated his skin and entered his sys-
tem; plaintiff was ignorant of their poisonous and harmful char-
acter; defendant failed to furnish proper masks or other protection.
plaintiff *inhaled* and *absorbed* such poisons; defendant knew plain-
tiff was inexperienced in these matters and failed to warn him con-
cerning them; when inquiry was made concerning their effects, de-
fendant's foreman assured him the effect of these vapors was not
harmful; defendant knew or by the exercise of due diligence should
have known, plaintiff would likely suffer injury therefrom; in July,
1935, he was compelled to refrain from work by reason of slow and
gradual breathing and absorbing of poisons which had accumu-
lated in his system.

The petition did not designate any particular injury by name,
but described his general condition as follows:

". . . he has had long and continued headaches, has spells of nervous-
ness; has been unable to sleep or get proper rest; that his digestive organs do
not function properly; that he has lost his appetite; his hearing is impaired;
his throat and lungs are injured and impaired and infected so that the plain-
tiff has difficulty in getting his breath; that his heart, arteries, blood vessels,
and other organs have become impaired and infected, and his whole system,
both nervous and physical, have become so filled with poison that his condition
is gradually growing worse instead of better; . . ."

The answer contained a general denial, except as to matters ex-
pressly admitted, and then alleged in substance: Plaintiff was ex-
perienced in the work in which he was engaged; the risk, if any,
of being injured as complained of, was a risk incident to the employ-
ment; plaintiff knew the conditions existing around the refinery or
by the exercise of reasonable care could have known of the dangers,
if any, to which he was exposed by reason of the inhalation of gas
and fumes which existed about a refinery, but notwithstanding these
facts plaintiff continued to work in and around the refinery and

thereby assumed the risk, if any, incident to the employment; plaintiff was furnished with gas masks to be used where necessary; he was instructed by the company to wear gas masks when engaged in work in any place where he would encounter gas; if plaintiff was injured by the inhalation of gases or fumes, which fact defendant specifically denied, then such injury occurred by reason of his own negligence and want of ordinary care.

Plaintiff's reply consisted of a general denial of all material allegations contained in the answer, except as admitted or qualified in his petition.

The jury returned a verdict for $1,500. Defendant insists the vapors, fumes and gases around its refinery were not poisonous or inherently dangerous or harmful to its employees, and the evidence did not show them to be. Next it is urged it was in nowise guilty of negligence in the operation of its refinery. It must be borne in mind this was not an action under our workmen's compensation act. Nor does that act create liability for occupational or industrial diseases. (*Chop v. Swift & Co.*, 118 Kan. 35, 233 Pac. 800; *Smith v. Cudahy Packing Co.*, 145 Kan. 36, 64 P. 2d 582.)

This was a straight action for damages due to alleged negligence of defendant. The injury was alleged to have been the result of industrial poisoning, and to have been occasioned by the *inhalation* of vapors, fumes and gases, and the *absorption* of oily substances, which it is claimed existed around the refinery. Plaintiff appeared to be suffering mainly from a lung ailment. His heart was seriously affected, but according to his doctor's evidence, the heart condition was the result of a lung disturbance. His doctor testified:

"There seems to be quite an accumulation of *solid material* in the bronchial tubes and lungs that show up through X rays, the bronchoscope, and by examination with a stethoscope." (Italics inserted.)

In the course of the trial this lung condition was discussed as pneumoconiosis—a disease of the lungs due to habitual inhaling of minute or metallic particles as of coal dust in anthracosis; miner's asthma or lung. Anthracosis is a chronic lung disease, is common among coal miners and is due to inhalation of coal dust. Plaintiff's doctor was certain plaintiff had an injury, but he did not think the ordinary gas which might be found around a refinery could cause pneumoconiosis. He said: "I rather think this man's coming in contact with a harder, flinty material is what caused his trouble." We shall pass over that difficulty for the moment.

This action was not based upon the violation of any statute. Defendant does not claim he sustained injury while being required to work on the inside of any particular still, tank or other enclosure which was permeated with poisonous vapors, fumes or gases. He does not contend he was injured at any particular work, time or place, but rather that over the period of his employment of about seven years, he inhaled gases, fumes and vapors and became impregnated with these and oily substances which existed about the refinery. The jury eliminated injury due to absorption through the skin of oily substances, vapors, fumes or gases, by a special finding that plaintiff's injury was caused by breathing gases and fumes.

When this refinery was opened defendant employed chemists to make tests for the purpose of determining whether it was harmful for men to breath the air about its refinery. These tests were made where gases might be expected around the refinery grounds, buildings and equipment. The chemists advised defendant the conditions at its refinery would not be harmful to its employees. Defendant also employed a physician to investigate various medical authorities on the subject. It was advised that breathing the air about this refinery would not cause occupational diseases, and that no harmful results would come from inhaling the fumes and gases at this refinery over a long period of time.

The evidence disclosed there are two types of crude oil—sweet oil and sour oil—sour oil contains hydrogen sulphide; "Hydrogen sulphide, in quantities of three or four hundred parts per million, is harmful if you stay in it for two or three hours; 3,000 parts per million would be fatal quite quickly;" only sweet oil was used at this refinery and it contained only two or three parts per million of hydrogen sulphide, whereas it required one hundred fifty to two hundred parts per million to be harmful; hydrogen sulphide gives off an odor of rotten eggs and is one of the strongest odors known to science; plaintiff observed this odor; the odor will result from concentration of far less than one-tenth part in a thousand parts of air; the gas and fumes from the sweet oil at defendant's refinery were almost exclusively hydrocarbons; the classes of hydrocarbon vary slightly—the lighter ones are simple asphyxiants, while the heavier ones have an anaesthetic effect like ether; fumes and vapors that arise from petroleum are not poisons but anaesthetics.

The jury made special findings the gases and fumes were harmful to the average employee, to a more or less degree, when breathed in small quantities over a long period of time.

Two types of gas masks were provided for use where gas hazards existed as well as bulletins of instruction concerning their availability and use. One type of mask was known as the canister gas mask. It was designed to give protection against inhalation of vapors or gases that might be encountered in open air places or inside of well-ventilated buildings where only low concentration of vapors was present. This type of mask was not to be used inside of enclosures such as pits, deep trenches, tanks or chambers. For places where high concentration of gas was likely to be encountered a blower type hose mask was provided. Both types of masks were made available at any time upon request. Plaintiff admitted he had been warned not to go into tanks without a mask and his testimony was that he complied with that warning. There is no evidence he was injured in the slightest on those occasions. He helped clean out what was known as "Dubbs" stills after the refining process was completed. The testimony of defendant was that these were freed entirely from all gases and fumes before anyone was permitted to enter them. Plaintiff's testimony in that regard was that no masks were furnished for that work and that he did not know whether masks were necessary. There was testimony that on one occasion—it is not clear just where—he had gotten some vapor and oil on his hands and that it burned the skin, smarted and hurt, and in a day or two the skin peeled off. He ran the coke engine part of the time and at times worked as an extra coke knocker. This work was all around the "Dubbs" stills. It appears that on one occasion, while observing the odor of rotten eggs, he inquired of his foreman whether there was danger of injury and he was told there was not. There is no evidence he was injured at that time or on any other similar occasion. According to his testimony he did observe a burning sensation in his throat and eyes. The regulations required that personal injury, however slight, must be reported at once to the company nurse. Plaintiff at no time during his entire term of employment reported any injury to her. As heretofore stated, plaintiff began to work for defendant in 1928. There was testimony he had suffered with rheumatism as far back as 1920, and again over a five-year period prior to 1935. He had made collections for that disability in 1935 on a health and accident benefit plan and on certificates of private physicians. He had also filed a claim with an insurance company for permanent disability benefits. The latter claim was also supported by a doctor's certificate showing "myo-

carditis and rheumatism—symptoms, swollen joints and fast heart." The jury, however, heard that testimony, and we may pass it.

Plaintiff worked at the refinery for seven years and other men had been working there from eight to twelve years, and, so far as plaintiff had known, they were not affected by gases at this refinery. Two former employees of defendant testified in the instant case. Both said they had noticed a rotten-egg odor about the refinery. One of them testified to the effect that he was sick practically all of the time he worked, and that he was sick at his stomach and generally had a headache. The other testified:

"My legs today hurt from ever since I have worked there; I have got no feeling clean from my toes to my hip—take and jab me with a pin, or take a cigaret and burn a blister and I don't feel it."

There was no evidence either of these witnesses had ever reported any injury to the company nurse. It is also worthy of note that neither of these men claimed they had breathed fumes or gases at this refinery. If they did so, neither of them complained of it affecting their lungs as did plaintiff. During the entire period the refinery had operated no other complaint similar to that of plaintiff was made to the company. A doctor who annually examined over two thousand employees of two refineries at Arkansas City, including defendant's refinery, had found no other case of pneumoconiosis. There was no evidence these vapors or fumes were poisonous. The evidence was to the contrary. There was no evidence defendant knew or by the exercise of reasonable diligence should have known they were harmful unless encountered in concentrated form. None of its employees had ever reported such an experience at its refinery where only sweet oil was used. It had sought the opinion of experts on the subject and was assured employees were not endangered. It had provided masks and instructions for their use even in open places where there might be occasion for their use. Furthermore, the evidence failed to support the jury's finding that plaintiff's disability was caused by gases and fumes. Plaintiff's private physician was the only expert witness upon whose testimony plaintiff relies. Upon the crucial point of whether plaintiff's disability was caused by vapors, gases or fumes, his doctor in substance testified: He rather thought this man's coming in contact with a harder, flinty material is what caused his trouble; there seemed to be quite an accumulation of solid material in the bronchial tubes and lungs; in his opinion the breathing of gases at the refinery was harmful over

a long period of time, but he did not know of any medical authority which supported that view; he thought he was familiar to some extent with the gases which would be encountered at the refinery, but was unable to identify the chemical radicals by name which plaintiff encountered; he could not say what there was around a refinery to cause pneumoconiosis; he knew of no medical authority which supported the theory that plaintiff could have gotten such a disease at a refinery; the average man apparently does not encounter marked ill effects from work at these places; he was of the opinion plaintiff was possibly an unusual type; his injury might be due to an idiosyncrasy.

Defendant first contends if plaintiff in fact sustained an injury the evidence discloses that the injury from which he suffered did not result from the causes found by the jury, namely, the breathing of fumes and gases. In view of the conclusion we have reached, it will not be necessary to rule on that contention. If that contention were answered there would still remain the all-important question of defendant's negligence. The jury was not asked and hence made no special finding on that subject. Plaintiff insists negligence inheres in the verdict. That is true provided there is evidence to support it. What was that evidence? Appellee, in substance, contends defendant owed plaintiff the duty to provide a safe place in which to work and that defendant's negligence consisted, first, in its failure to provide such a place, and second, in its failure to warn plaintiff of the inherent danger of inhaling and absorbing poisons. It is claimed these charges of negligence are sustained by decisions of this court in the cases of *Echord v. Rush,* 124 Kan. 521, 261 Pac. 820, and *Fritchman v. Chitwood Battery Co.,* 134 Kan. 727, 8 P. 2d 368. The facts in those cases were entirely dissimilar to those in the instant case. In the Echord case the negligence consisted in the failure of defendant to comply with safety provisions of specific mining laws, by reason of which negligence poisonous gases accumulated in the mine where the employee worked and which poisons were necessarily inhaled day by day. In the Battery case, plaintiff, a boy about seventeen years of age, was employed in the making of storage batteries. Much of his work consisted in making new batteries out of old discarded ones. Plaintiff worked within an enclosure. The work raised clouds of lead and oxide dust which settled on the floor, ceiling, walls, tools, equipment, and on the hands and arms of the workman. The dust was inherently poisonous.

There was no ventilator or flue over the lead vat where plaintiff worked, for a part of the time and in the winter period the doors and windows were closed. The result was lead poisoning. A reading of that opinion will readily disclose defendant there made no contention that lead dust was not inherently poisonous nor that it was unaware of that fact. It should be noted the opinion said, "The lead dust was very poisonous *in its nature.*" Defendant there contended even a seventeen-year-old boy should have known that lead dust was poisonous and that therefore no warning was necessary. It was held the question of plaintiff's knowledge of the poisonous character of the dust was properly a question for the jury on the issue of contributory negligence. In the instant case there was no evidence the fumes and gases at this refinery were inherently poisonous. The evidence was to the contrary. Nor was there evidence defendant knew or in the exercise of due care should have known the fumes and gases from the sweet oil at this refinery would be harmful to plaintiff unless they were encountered in concentrated form. Touching the character and nature of fumes and gases at refineries plaintiff refers to articles contained in books on "Industrial Health," and "Industrial Poisons," some of which were introduced in evidence at the trial. They are not very helpful. The real question at issue in this case was what was the nature of the fumes and gases dispelled from the oil at this refinery at which plaintiff claimed to have been injured, and should defendant have known they would be injurious to plaintiff and hence required warning of that fact other than that which was given? The question did not concern fumes and gases resulting from the refining of oil which contained entirely different chemical combinations and which was refined under perhaps very dissimilar methods in Russia, Texas, or elsewhere.

Did defendant's negligence consist in a failure to provide the necessary machinery, equipment and safety appliances to prevent injury? What is the test in that regard? In *H. D. Williams Cooperage Co. v. Headrick* (C. C. A. 8) 159 F. 680, 682, it was said:

"The master is not required to furnish the best, the safest, or the newest appliances or methods of operation, nor to adopt extraordinary or unusual safeguards against risks and dangers. The limit of his duty here is to exercise ordinary care to supply reasonably safe places, appliances, and methods. The test of his discharge of this duty is the exercise of ordinary care to supply such places, appliances, and methods as persons of ordinary intelligence and prudence commonly furnish in like circumstances." (See, also, *Grammer v. Mid-Continent Petroleum Corp.,* 71 F. 2d 38, 39 C. J. 313.)

The machinery at this refinery consisted of standard equipment. There was no evidence the masks provided were inadequate or unavailable. What about the requirement of warning as to plaintiff in the instant case? The fumes and gases were not poisonous nor shown to be inherently dangerous except in concentrated form. An injury similar to that complained of by plaintiff was unknown at this refinery. Chemists and doctors upon investigation had pronounced the conditions safe. We need not, however, and do not rest this decision solely upon their conclusions. Plaintiff's own doctor testified:

"Q. You mean by that that this man has some idiosyncrasy which makes him more susceptible than others? A. He very likely does."

In the early case of *C. B. U. P. Rld. Co. v. Henigh, Adm'r*, 23 Kan. 347, it was said:

"But no person is bound to anticipate something which is not likely to occur, or to so conduct his affairs as to prevent accidents which are not likely to happen." (p. 358.) (See, also, *A. T. & S. R. Rld. Co. v. Plaskett*, 47 Kan. 107, 26 Pac. 401.)

Where an accident was exceedingly rare, not having occurred before within the knowledge of a foreman during twenty years' experience in that business, and the utensils with which the employee was working were of the most approved kind, it was held the fact that employee was not warned he was working in a dangerous business would not sustain a verdict. (*Poneh v. Railroad Co.*, 83 Kan. 226, 109 Pac. 771.) In 18 R. C. L., section 78, it is said:

"Not only must the danger of an employment, in order to create a duty of warning and instruction, be one that is unknown to the employee, but it also must be one that is known to the employer or might be known to him by the exercise of reasonable vigilance. The employer is not bound to foresee and give warning of remote, improbable, and exceptional occurrences; his duty is limited to such perils as reasonably are to be anticipated." (p. 571.)

In 39 C. J. 288 the rule is stated thus:

"The master is not compelled to foresee and guard against an accident which reasonable and prudent men would not expect to happen, and where an injury to a servant could not reasonably have been anticipated, a failure to take precautionary measures is not negligence on the part of the master for which he is liable to the servant. But where the facts are such that the consequences attributable to the negligence of a master are within the field of reasonable anticipation, he is liable for an injury received by a servant in consequence thereof." (§ 415b.)

It follows defendant's duty to furnish safe working conditions is not absolute. The employer is not an insurer. (*L. & N. R. Co. v.*

*Wright*, 183 Ky. 634; *McCreery v. Libby-Owens-Ford Glass Co.*, 363 Ill. 321, 2 N. E. 2d 290 [for scope of doctrine, knowledge of employer and limitation on duty to warn, see annotation to that case, 105 A. L. R. 80]; *M. T. Stevens & Sons Co. v. Daigneault*, 4 F. 2d 53; *Pennsylvania Pulverizing Co. v. Butler*, 61 F. 2d 311; *Grammer v. Mid-Continent Petroleum Corp.*, supra.) In the Grammer case it was said:

"An employer is not an insurer; his duty to furnish safe working conditions is not an absolute one, although it is nondelegable; his duty is to use reasonable care to that end." (p. 40.)

It was not the duty of the employer to anticipate a particular injury to an employee which very likely resulted by reason of the employee's peculiar physical condition, of which it had and could have had no notice.

It is urged the jury found the average employee suffered a similar disability to a more or less degree. It did so find. The finding was objected to as being evasive, indefinite and not supported by the evidence. The objection should have been sustained. There was no evidence any other employee had suffered pneumoconiosis at this refinery, even in a mild form. The evidence of plaintiff's doctor was to the effect that in his opinion fumes and gases at the refinery were harmful when breathed in small quantities over a long period of time. That might well be said concerning dust in city streets, on country roads and smoke even in residential districts where soft coal is burned in furnaces. In the Grammer case it was said:

"Appellant invokes another rule of law, supported by respectable authority, that where employees work with known poisons or in the presence of *inherently* dangerous instrumentalities, the employer must search for lurking dangers, and is held to know whatever science might discover. In *Green v. Standard Wholesale Phosphate & Acid Works* (D. C. Md.), 29 F. 2d 746, 748, this rule is stated: 'Proof of actual knowledge is not required where the article is so made up as to be *inherently* harmful, and he cannot excuse himself upon the ground that he did not know its dangerous qualities.' (Citing numerous decisions.)

"The principal question in the case, therefore, is this: Was appellee dealing with substances inherently dangerous within the doctrine of these cases? To bring this case within that doctrine, it is not enough that it was known that traces of noxious gases were present. Many poisons are comparatively harmless when the dosage is diluted. Nicotine, concentrated, is a deadly poison. But an employee, permitted to work where men smoke, could not invoke the doctrine of inherently dangerous substances. The question here is, Did appellee have any reason to suspect the presence of these gases in dangerous quantities?" (p. 41.) (Italics inserted.)

In the present case the evidence disclosed the fumes and gases were not inherently poisonous. It further disclosed that in the opinion of experts nonpoisonous substances did not exist in dangerous quantities. Then wherein did the negligence of defendant exist in failing to warn plaintiff beyond the warnings it in fact gave? The evidence discloses none.

In the Grammer case, as here, the contention was the employee had contracted pneumoconiosis at defendant's refinery while working around the stills of that refinery. It is there said that until that suit was filed no occupational disease had been known to result. In the opinion of that case is contained an interesting and instructive statement of the general methods employed in the operation of stills at refineries. That refinery used sweet or low-sulphur content crudes. The principles involved in the instant case are there treated in a lengthy opinion containing numerous citations of authority. The case is similar in the main to the instant one except for the fact plaintiff was not there shown to be more susceptible to the disease of pneumoconiosis than other employees. That court held:

"Tested by the principle of fault which underlies recovery for injuries at common law, we do not believe the appellant has established her case." (p. 45.)

The disease in the instant case was a hazard of the industry. It would seem only just and proper the loss occasioned in that industry should, as a loss resulting from an accident, be borne by the industry. For such provision we are, however, obliged to wait for appropriate action by the legislature which alone can make that result possible. Until such legislation is enacted recovery must continue to be based solely on negligence. We are not permitted to engraft upon the present law a recovery without proof of the negligence charged. In the light of principles herein announced and especially in view of the plaintiff's apparent peculiar susceptibility to this disease, we are forced to the conclusion that negligence of defendant was not established. It follows defendant's demurrer to plaintiff's evidence, and its motion to set aside the general verdict and to render judgment in its favor on the special findings should have been sustained. The cause is therefore remanded to the trial court with directions to enter judgment for defendant.