James L. MURPHY, Plaintiff,

v.

OWENS–CORNING FIBERGLAS CORPORATION, Defendant.

No. KC–3599.

United States District Court, D. Kansas.

Dec. 6, 1977.

**560**

Lloyd Burke Bronston of Bronston & Smith, Overland Park, Kan., for plaintiff.

Ronald C. Newman and Charles O. Thomas of Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., for defendant.

### MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This case is now before the court for determination of the defendant's motion for judgment notwithstanding the jury verdict or, in the alternative, for a new trial. The jury trial of this action commenced on March 21, 1977, and was premised upon the defendant's alleged negligence in failing to provide the plaintiff, its employee, a reasonably safe place in which to work. After four days of testimony, at the conclusion of the trial, the jury returned a verdict for the plaintiff in the amount of $275,000—the sum prayed for in the complaint. The defendant's motion is based upon the arguments that said verdict is wholly unsupported by substantial competent evidence and that the court erred in failing to properly instruct the jury as to the applicable law. The court has devoted much time and consideration to these arguments, and has scrutinized in great detail the transcript of the trial proceedings and the evidence found therein. This process of re-examination has led the court to conclude that the challenged verdict cannot stand and that the defendant's motion for judgment notwithstanding the verdict must, for the reasons set forth in more detail below, be sustained.

### I. *MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.*

The standard to be applied in evaluating a motion for judgment n. o. v. is essentially the same as that applied in evaluating a motion for a directed verdict. See *Oldenburg v. Clark*, 489 F.2d 839 (10th Cir. 1974); *Taylor v. National Trailer Convoy, Inc.*, 433 F.2d 569 (10th Cir. 1970); Federal Rules of Civil Procedure, Rule 50(b). In considering a motion for judgment n. o. v., the trial court is bound to view the evidence in the light most favorable to the party against whom the motion is made. *E. g.*, *Weeks v. Latter-Day Saints Hospital*, 418 F.2d 1035 (10th Cir. 1969); *Gulf Insurance Company v. Kolob Corp.*, 404 F.2d 115 (10th Cir. 1968). The fact that the record so viewed contains a "scintilla" of evidence in support of the challenged verdict—or perhaps barely refutes a contention that there is "no" evidence supporting a party's case—presents no legal barrier to entry of a judgment n. o. v. *E. g.*, *Yazzie v. Sullivent*, 561 F.2d 183 (10th Cir. 1977); *Swearngin v. Sears Roebuck & Co.*, 376 F.2d 637 (10th Cir. 1967). The critical question is whether the record contains evidence "upon which the jury could probably find a verdict" for the party against whom the motion is made. *Yazzie, supra.* Thus, while judgment n. o. v. may not be granted "unless the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom motion is made," *Symons v. Mueller Co.*, 493 F.2d 972 (10th Cir. 1974), a motion for

judgment n. o. v. should be sustained where "the evidence and all the inferences to be drawn therefrom are so patent that minds of reasonable men could not differ as to the conclusions to be drawn therefrom." *Taylor*, 433 F.2d at 571–72. See also *Stiner v. United States*, 524 F.2d 640 (10th Cir. 1975); *Bertot v. School District No. 1, Albany County, Wyo.*, 522 F.2d 1171 (10th Cir. 1975); *Wright v. American Home Assurance Co.*, 488 F.2d 361 (10th Cir. 1973).

Application of these standards to the case now before us is appropriately prefaced with a brief summary of the basic facts introduced in support of the plaintiff's claim. The plaintiff James Murphy was employed in various capacities at the defendant's plant in Kansas City, Kansas, from 1959 to 1970, at which time he was disabled from further employment due to chronic obstructive lung disease or pulmonary fibrosis—conditions allegedly resulting from the defendant's negligent failure to provide a reasonably safe working environment. The plaintiff's theory at trial was that the airborne combination of "chemicals + dust + heat" in the Owens-Corning plant had proximately caused the disease and deterioration of his lungs. He asserted that his pulmonary disability resulted from negligence, in that the defendant had (1) failed to inspect the air in its plant and to determine the effects thereof upon its employees, including the plaintiff; (2) failed to warn or inform its employees, including the plaintiff, when it knew or should have known that the air was harmful to human beings; (3) failed to remove minute fibrous glass particles and dust from the general plant area; (4) failed to minimize harm to its employees, including the plaintiff; (5) failed to inform plaintiff of his deteriorating condition of health in August, 1970, upon having plaintiff examined by a physician; and (6) failed to provide plaintiff with a safe place to work.

■ Under Kansas law, there is no question but that an employer has a duty not to expose his employees to perils and dangers against which the employer may guard by the exercise of reasonable care, and that a part of this duty is to furnish a reasonably safe place in which to work. *E. g., Taylor v. Hostetler*, 186 Kan. 788, 352 P.2d 1042 (1960); *Fishburn v. International Harvester Co.*, 157 Kan. 43, 138 P.2d 471 (1943). It is equally clear, however, that a master is not an insurer against all injuries which his servants may suffer in the discharge of their duties. *E. g., Uhlrig v. Shortt*, 194 Kan. 68, 397 P.2d 321 (1964); *Blackmore v. Auer*, 187 Kan. 434, 357 P.2d 765 (1960). The Kansas Supreme Court has reiterated time and time again the legal axiom that an employer's duty to furnish safe working conditions is not absolute and that an employee's recovery for breach thereof is dependent upon proof of negligence. In *Allen v. Shell Petroleum Corp.*, 146 Kan. 67, 68 P.2d 651 (1937), the Kansas Supreme Court formulated the test of employer negligence as follows:

> "The master is not required to furnish the best, the safest, or the newest appliances or methods of operation, nor to adopt extraordinary or unusual safeguards against risks and dangers. The limit of his duty here is to exercise ordinary care to supply reasonably safe places, appliances, and methods. The test of his discharge of this duty is the exercise of ordinary care to supply such places, appliances, and methods as persons of ordinary intelligence and prudence commonly furnish in like circumstances."

■ Further, because under fundamental principles of tort law the risk of injury defines the duty to be obeyed, *Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928), the Kansas Supreme Court has held that " 'the master is not compelled to foresee and guard against an accident which reasonable and prudent men would not expect to happen, and where an injury to a servant could not reasonably have been anticipated, a failure to take precautionary measures is not negligence on the part of the master for which he is liable to the servant.' " *Dodd v. Wilson & Co., Inc.*, 149 Kan. 605, 88 P.2d 1116 (1939). An employer is therefore not liable

for failing to anticipate idiosyncratic injury to' a particular employee, arising from the employee's peculiar physical condition of which the employer had and could have no notice. *Allen, supra.* An employer's duty does not extend to the prevention of or warning against remote, improbable, and exceptional occurrences; it is limited to such perils as reasonably are to be anticipated.

■ Finally, in determining the issue of employer negligence, proof of customary practices in the relevant industry is both relevant and highly probative. Because the duty of care owed by the employer is that which is exercised by the average prudent individual in similar circumstances, and because "what men ordinarily do is ordinarily prudent and careful," *Blackmore v. Auer,* 187 Kan. at 442, 357 P.2d at 772, an employer will generally not be held liable if he conducts his business in a manner conforming with the usage of others engaged in the same business under similar circumstances. *Uhlrig v. Shortt, supra.* Evidence of customary usage in a particular business or industry is clearly not conclusive of the question of reasonable care in a given circumstance, *Walker v. Colgate-Palmolive-Peet Co.,* 157 Kan. 170, 139 P.2d 157 (1943), for the existence of negligence in each case must depend upon the particular circumstances surrounding the parties at the time and place of the occurrences on which the controversy is based. An employee is therefore not required to prove, as a necessary element of his case, that his employer either adhered to an unreasonable or imprudent industrywide practice or imprudently deviated from commonly acceptable customary practices. As a practical matter, however, evidence of customary practices within an industry may be among the most relevant and probative evidence available, and its absence in a case such as the one now before the court may severely impair the employee's ability to satisfy the relevant burden of proof. That burden of proof, summarized by the Kansas Supreme Court, is as follows:

"Negligence is never presumed. It must be established by proof, but it may be shown by circumstantial evidence where the circumstances are proved and their relation to each other is such that intelligent, fair-minded triers of fact may with reason find that the negligence with which the defendants are charged has been established. To meet the burden of proof on the issue of negligence the evidence must be substantial and satisfy the obligation imposed upon a plaintiff in a civil action to prove such negligence by a preponderance of the evidence." *Blackmore v. Auer,* 187 Kan. at 440, 357 P.2d at 770.

At the conclusion of the trial of this matter, the jury was fully instructed on the substance of the law stated above. The question to be resolved is whether the jury's verdict for the plaintiff, in view of the evidence on which it was based, can be reconciled with the relevant Kansas case law. Determination of this question requires us to examine in turn the various claims of negligence on which the plaintiff's case was based.

1. *The Defendant's Failure to Inspect the Air in Its Plant and to Determine the Effects Thereof Upon Its Employees.*

Viewed in the light most favorable to the plaintiff, the evidence concerning the defendant's testing and inspection procedures during the relevant period 1960–1970 was as follows: Commencing in 1962, the Industrial Hygiene Section of the Engineering Division of Aetna Life and Casualty Company conducted annual or biannual industrial hygiene surveys at the defendant's plant at places where, due to the particular manufacturing process involved, it was felt that there was or might be a possible occupational health hazard due to the presence of airborne chemicals or dust. In determining whether the presence of such contaminants constituted a health hazard, the inspectors from Aetna referred to the so-called "threshold limit value" (TLV) published by a respected committee of the American Conference of Governmental Industrial Hy-

gienists (ACGIH). The TLV established by the ACGIH committee for each particular contaminant was reviewed on a yearly basis and modified according to industrial experience and additional. toxicological studies; TLV standards for humans were generally established at one tenth of the pollutant concentration level to which test animals could be exposed without suffering discernible harm. Because of this "safety factor" thus built into the TLV standards, each TLV represented conditions under which it was believed that nearly all workers could be "repeatedly exposed day after day without adverse effects." The frequency and nature of the air testing done by Aetna, as well as the procedures employed, conformed to both standard industrial hygiene procedures and procedures in effect in American industrial plants at that time. Aetna communicated to the defendant the results of each test, together with its analysis and recommendations if warranted by the test results.

Aetna's testing was conducted in those places within the defendant's plant where it was suspected that potential health hazards existed due to proximity to particular manufacturing processes. Early tests in 1962 and 1963 were principally concerned with phenol and formaldehyde gases and dust; isolated tests for airborne fiberglas particles were not conducted because it was generally believed that such particles were "inert," i. e. even if inhaled, such particles would cause no physical or chemical reaction in the tissue of the lungs. Beginning in 1964, however, the ACGIH decided "to take a good look at fiberglas to see if there was [sic] any possible toxic effects," and "came up with a weight figure that they felt it might be desirable to at least look at, at the time." This tentative TLV was two milligrams of airborne fiberglas dust per cubic meter of air. In 1964 or 1965, based upon industrial experience and experimental human and animal studies, the ACGIH raised the suggested TLV to 5 milligrams per cubic meter of air. By 1970, the ACGIH threshold limit committee had determined that "there was no evidence to indicate that fiberglas was a problem;" it

therefore classified airborne fiberglas particles as "nuisance" dust—one with "a long history of little adverse effect on lungs" and that did not produce "significant organic disease or toxic effect when exposures are kept under reasonable control." Upon reaching this conclusion, the ACGIH raised the TLV for fiberglas as a nuisance dust to 15 milligrams per cubic meter of air.

With two exceptions, all tests from 1964 to 1970 indicated that the concentration of fiberglas particles in the defendant's. plant were well within the TLV in effect at the time of the inspection and testing procedures. The two exceptions, in 1968 and 1969, involved test situations in the reconditioning loading area of the defendant's plant—an area in which the plaintiff worked in 1964–65, but not thereafter. Further, in no case did a test conducted in the vicinity of the plaintiff's work station indicate that concentrations of phenol, formaldehyde, carbon monoxide, or other chemicals or airborne contaminants exceeded the respective TLV's established by the ACGIH.

The accuracy of the above-mentioned industrial hygiene studies was not questioned at the time of trial. The bulk of the plaintiff's evidence proceeded along the line that more extensive testing was called for in the circumstances. It was shown that the fore-hearth area in which the plaintiff worked from 1965–70 was never tested for "any and all" chemicals that might be present, or for fiberglas particles, because of Aetna's policy to inspect only those locations in which environmental health hazards seemed most probable. There was evidence that at least some of the defendant's employees felt that industrial hygiene tests were selectively conducted only when conditions in the plant were relatively "clean." There was further evidence that testing procedures might have been conducted more frequently and by arguably more accurate methods, e. g., having each employee wear air-testing equipment at his work station throughout the course of his duties.

■ There would seem to be no question but that under the Kansas cases cited above, an employer is obligated to make a

reasonable inspection to discover latent or concealed dangers in his place of work. What constitutes an adequate and proper inspection or test must depend on the circumstances of a particular case; an adequate inspection must, however, be such as a reasonably prudent man in the exercise of reasonable care would deem necessary under the same or similar circumstances. The court is convinced that the evidence in this regard will sustain no reasonable inference of negligence and that, to the extent the jury's verdict may have been based upon such a finding, it must be set aside. First, the defendant's testing and inspection procedure was conducted in conformance with a customary and generally approved industrywide practice that was in no way suggested or shown to be insufficient or negligent. Second, there was no evidence that more frequent testing would have disclosed the existence of any danger to the plaintiff or any other employees of the defendant. Third, there was no evidence that testing at the plaintiff's individual work station would have revealed the existence of any occupational health hazard that might be reasonably anticipated by the defendant. Fourth, neither was the defendant's 30 years of experience in the fiberglas industry nor the experience of experts in the field of industrial hygiene such as to put Owens-Corning on notice as to the probable existence of an occupational health hazard in any part of the plant where the plaintiff worked. In these circumstances, as a matter of law, the defendant could not be charged with a legal duty to employ unusual or extraordinary tests or to adopt the latest, most improved, and most extensive methods of testing and inspection. In the court's opinion, the minds of reasonable men could not differ from the view that the defendant's testing and inspection procedures were adequate and reasonable.

2. *The Defendant's Failure to Warn and Inform Its Employees, Including the Plaintiff, When It Knew or Should Have Known That the Air Was Harmful to Human Beings.*

Analysis of this aspect of the plaintiff's case requires us to address two distinct but interrelated questions: (1) Was the air in the defendant's plant harmful to human beings? (2) If so, did the defendant know, or should it have known, of the potential danger to which its employees were exposed?

Even viewing the evidence in the light most favorable to the plaintiff, it is readily apparent that the record is devoid of evidence that the air in the defendant's plant could be generally described as "harmful to human beings." All tests conducted for formaldehyde, ammonia, carbon monoxide, and fiberglas dust in situations not dissimilar from those in which the plaintiff worked established—as we noted above—that the contaminant levels were well within the prescribed threshold limitation values in effect at the time of the tests. The plant physician, Dr. Earl C. Sifers, testified that in twenty years of treating the defendant's employees he had never seen a case in which the combined inhalation of chemicals and fiberglas particles caused pulmonary problems of the kind suffered by the plaintiff. General experience in the fiberglas industry, together with the information based upon experimental human and animal studies, led the ACGIH during the period in question to progressively raise its tentative TLV's for fiberglas particles and eventually to classify it as a nuisance dust producing no significant organic disease or toxic effect. Under no rational view of this overwhelming evidence could the air in the defendant's plant be deemed "harmful."

The plaintiff's only evidence to the contrary consisted of testimony by Dr. William E. Evans, M.D., to the effect that (1) inhalation of formaldehyde vapors causes irritation to the mucous membranes of the lungs and reduces the ability of pulmonary cilia to rid the lungs of foreign materials; (2) inhalation of ammonia vapors has the same physiological effect upon the lungs; (3) inhalation of carbon monoxide gas decreases the amount of oxygen carried in the bloodstream; (4) heat tends to dry the mu-

cous membranes in the respiratory tract and reduces the ability of the cilia to remove extraneous material from the lungs; (5) lung tissues often have an allergic reaction to fiberglas particles; and (6) the combination of formaldehyde, ammonia, carbon monoxide, heat, and airborne fiberglas particles may completely overwhelm the defense mechanisms of the body and cause total physical disability. Dr. Evans' testimony was hardly probative of the plaintiff's allegation that the air in the defendant's plant posed any general danger to human health, however, for there was no evidentiary correlation between his hypothetical medical testimony and the conditions actually existing at the defendant's plant during the relevant periods of time. Dr. Evans' testimony failed to indicate what concentration of the above-mentioned chemicals would be necessary before their deleterious effects would materialize, and he did not pretend to testify that the air in the defendant's plant exceeded such concentrations. Furthermore, his testimony openly acknowledged that the air quality in the defendant's plant was well within the threshold limit value promulgated for such contaminants by the ACGIH, a body whose expertise Dr. Evans recognized and in whose judgment Dr. Evans had confidence. Aside from Dr. Evans' testimony, there is no evidence in the record that the air in any part of the defendant's plant in which the plaintiff was employed was generally "dangerous" to human health.

Even assuming that some such danger were present, the court could by no means accept the plaintiff's contention or the jury's possible conclusion that the defendant's failure to warn of such danger was negligent or otherwise reprehensible: the record simply supports no rational inference that the defendant knew or should have known of the existence of such danger. The plaintiff's expert witness on this subject, Dr. Evans, expressly acknowledged that the TLV standard promulgated by the ACGIH were the work of "a recognized group of experts" in the field of industrial hygiene; that such standards represented the best judgment available on the basis of

present-day scientific ability and knowledge; and that the defendant was "well justified" in relying on current standards adopted by that group. In addition to this testimony, the record contains the results of industrial health surveys that were conducted during the 1960's and early 1970's and that gave rise to a consensus of medical opinion that employees in the fiberglas industry suffered no particular risk of occupational lung disease in conditions similar to those at the defendant's plant. The plaintiff did not contend that the defendant had actual knowledge of the "danger" posed in its plant by the conditions in question. Yet, the overwhelming weight of the scientific evidence of which the defendant might be charged with constructive knowledge pointed to the conclusion that the conditions in the defendant's plant—which complied with contemporary industrial hygiene standards—posed no danger to human health.

In the court's view, the evidence herein is susceptible of no rational inference that the defendant knew or should have known of any latent danger to human beings arising from the quality of the air in its plant. No reasonable person could conclude that the defendant's failure to warn of such "danger" constituted negligence or other such conduct as should properly render it liable in the circumstances. Accordingly, to the extent that the jury's verdict may have been based upon any such finding, it must be set aside. Where there is no appearance of danger, an employer is not required to caution its employees against unexpected or improbable perils; its duty to warn is limited to such dangers as may reasonably be anticipated. Under this standard, a finding for the plaintiff must be viewed as patently unsupported by the evidence introduced at trial.

3. *The Defendant's Failure to Remove Minute Fibrous Glass Particles and Dust From the General Plant Area.*

The plaintiff's theory was that his disability was "really" caused by conditions in the forehearth area of the defendant's plant,

where he worked from 1965 to 1967. According to the plaintiff, the forehearth area was a metal platform approximately 25 feet long, 18 feet wide, suspended some 15 to 20 feet above floor level. The north end of the forehearth area was comprised of a blast furnace from which molten glass flowed into "spinners" inside large steel tanks. The crystallized molten glass was thereafter "hit" with air, which drove it down into a ring where it was sprayed with a liquid chemical binder. The product thus produced—uncured fiberglas wool—was then pulled down into large pits or holes in the floor. The west side of the forehearth platform was bounded by an enclosed, air-conditioned room housing various instruments relating to the forehearth production processes. The south end of the forehearth area was enclosed only by a partition over which the operator could look to the lines running beneath the platform. To the east, the forehearth area was not enclosed; that "wall" consisted of seven large cylinders suspended at eye level over the holes in which the fiberglas wool was collected. The "ceiling" of the forehearth area is not enclosed but had various pipes "running around everywhere." In the forehearth area, according to the plaintiff, fiberglas wool accumulated all over the pipes and machinery; chemicals in the air burned his eyes, nose, and mouth; the heat in the summer months approximated 140–145 degrees Fahrenheit; and the air was full of dust and glass particles that were not generally visible but that produced a gritty irritation to the skin. Forehearth employees were furnished air hoses with which to blow "glass and stuff" to the floor, so that it could be swept up and discarded, but the plaintiff knew of no air purification mechanisms or other precautions taken to ameliorate the dusty conditions in which he worked. Ventilation in the forehearth area was, in the plaintiff's view, inadequate.

Evon B. Austin, Safety Director for the defendant's plant, testified that all forehearth areas were ventilated by (1) ten rows of overhead windows 150 to 200 feet long; (2) four "schmigs"—large floor-level apparatus that pulled from the plant's production lines 15,000 cubic feet of air per minute; and (3) two to three large "forming fans," each pulling 50,000 cubic feet of air per minute, that sucked glass into the floor-level pits described above. Austin also testified that because water was present in troughs in the forehearth area and because the fiberglas processed there was "moist and sticky" due to spray application of chemical binders, there were "hardly any" airborne fiberglas particles in the vicinity of the forehearth. Further, Austin testified that several machines in the defendant's plant were covered with hoods in order to collect and prevent dust in the air, and that twice a year the defendant engaged an outside firm to clean areas of the plant that the defendant's employees could not get to on a regular basis.

An employer's duty to furnish safe working conditions is not absolute, *Allen v. Shell Petroleum Corp.*, 146 Kan. at 75, 68 P.2d at 656; it is required merely to exercise "ordinary care" to supply such a place of work as persons of ordinary intelligence and prudence commonly furnish in like circumstances. Here, any evidence that the defendant failed to conform with commonly accepted standards of good housekeeping or industrial hygiene is conspicuously absent. The same may be said of proof that significant improvement of the air quality in the defendant's plant was technologically possible and economically feasible during the time period in question. The jury here was asked to presume the existence of negligence from the mere fact that dust and fiberglas particles were sometimes visible in the air and tended to accumulate on pipes and machinery throughout the plant.

Was the defendant negligent in failing to more nearly purify air in its plant that it believed or had reason to believe—based upon reasonably thorough and frequent inspection and testing within its plant, the work of respected authorities in the field of industrial hygiene, and the contemporary state of the medical sciences, as well as its experience of some 30 years in the fiberglas industry—posed no danger to the health or well-being of its employees?

We think not. First, the court has previously rejected any suggestion that "the defendant knew or in the exercise of due care should have known that the physical conditions in its plant posed a risk of danger to the health of its employees." Given merely the defendant's reasonable understanding that dust-related occupational disease among its employees was improbable at the least, and that such disease was reversible if indeed it should occur, any liability of the defendant cannot be premised upon the latter's failure to take extraordinary or unusual air purification steps.* Second, there was no evidence at trial that "cleaner" air would have prevented the onset of the plaintiff's disability. To the contrary, expert testimony strongly suggested that this particular plaintiff—because of his history of smoking and various pulmonary problems—acutely suffered from exposure to even minute quantities of dust and other airborne contaminants. Further, there was no evidence that absolute air purity was technologically and economically possible in the context of the defendant's manufacturing process. The plaintiff indeed made no effort to show that the air purification measures employed by the defendant were not the best available at the time.

To sustain the plaintiff's verdict on the dust control issue, the court would be compelled to apply a "white glove" test to a major industrial operation. The dearth of evidence relating to accepted standards of industrial housekeeping and to standards technologically capable of achievement in the 1960's and early 1970's requires the court to conclude that the jury's verdict on this question must have been based upon sheer speculation. Intelligent, fair-minded triers of fact could not reasonably have found by a preponderance of the evidence that the defendant was negligent on this score. Accordingly, to the extent the jury's verdict may have rested on this ground, it must be held for naught.

4. *The Defendant's Failure to Minimize Harm to Its Employees, Including the Plaintiff.*

This claim, the court assumes, specifically refers to the defendant's failure to institute a program of medical checkups of its employees for the purpose of detecting early symptoms of pulmonary disease and dysfunction. While the evidence relating to this point is limited, it appears that the defendant's policy was to rotate employees in "high density areas" (*i. e.* the batch house) for mandatory periodic x-ray examinations. No such program for detecting early signs of respiratory problems existed for other employees, but the defendant's policy was to provide free chest x-rays for any employee at any time. Except for the periodic checking of "high density area" employees and the routine pre-employment examinations given to new employees, the defendant maintained no medical programs aimed at the prevention or early detection of occupational lung disease; the plant's medical clinic was principally oriented towards treating both occupational and non-occupational illnesses or accidents at the request of affected individual employees.

For reasons similar to those discussed earlier, this limited evidence is clearly incapable of supporting an inference of negligence. The court finds as a matter of law that the defendant, acting as it did upon a reasonable belief that the working environment in its plant created no danger of occupational lung disease, was not legally obligated to conduct periodic medical examinations of all employees for the purpose of detecting the existence or onset of pulmonary disease. No evidence introduced at trial tended to establish that (1) reasonable and prudent employers in similar situations conducted or should have conducted such tests; (2) the tests medically available to the defendant would have materially heightened the defendant's awareness of pulmonary disease as an occupational hazard of its plant; or (3) such tests were capable of detecting pulmonary dysfunction at any point in which the disease was capable of treatment to reverse or mitigate a particular employee's disability. In short, no reasonable person could conclude that there existed a causal relationship between the plaintiff's disability and the defendant's

failure to require mandatory physical examinations of its employees. Accordingly, to the extent that the jury's verdict may have been based upon the allegation of the defendant's negligent failure to conduct periodic mandatory physical examinations of its employees, said verdict cannot be allowed to stand.

5. *The Defendant's Failure to Inform Plaintiff of His Deteriorating Condition of Health in August of 1970, Upon Having Him Examined By a Physician Which it Selected.*

The court has some difficulty ascertaining the factual gist of this allegation. According to the plaintiff, the "real" cause of his disability was the working environment in the forehearth area where he worked "upstairs" from 1965 to 1968 and "downstairs" from 1969 to 1970. In November, 1969, the plaintiff experienced severe chest pain. The defendant's nurse referred him for x-rays. According to the plaintiff, however, he was given no treatment and he returned to work on the assurance that he was "okay." In August, 1970, the plaintiff experienced a recurrence of chest pain and again reported to the defendant's medical clinic for x-rays. The plaintiff was again assured that nothing was wrong with him, and several days later he returned to work. He continued to work until October 10, 1970, when he was hospitalized by his personal physician, Dr. Evans.

According to the records of Dr. Sifers, the plant physician, the plaintiff last visited him on August 10, 1970, at which time he complained of "just cough and cold." The plaintiff had experienced repeated attacks of bronchitis, persistent cough, and sinus drainage over the eleven years (1959–1970) that Dr. Sifers had treated him, and the doctor did not feel that hospitalization for further examination of these symptoms was warranted. There was no evidence in Dr. Sifers' records that the plaintiff had ever complained that his respiratory problems were occupationally related. Dr. Florence MacInnis, the defendant's pulmonary expert at the trial of this case, compared x-rays of the defendant taken in 1969 and 1974 and concluded that the plaintiff's pulmonary fibrotic condition had remained virtually unchanged during that period.

■ This is not a medical malpractice case, and in the court's view this particular allegation has little or no relationship to the question of the defendant's negligence in failing to provide a reasonably safe place to work. It is sufficient for our purposes to note that there was no evidence that the medical services rendered the plaintiff by the defendant's medical clinic were deficient. Just how the defendant's "failure to inform the plaintiff of his deteriorating physical condition in August, 1970," might have caused or aggravated his present disability is a total mystery so far as the present record is concerned. There is certainly no suggestion that in August, 1970, the plaintiff ignored his own knowledge of "sharp chest pain" and, relying to his detriment upon the reassurances of Dr. Sifers, forsook the opportunity to obtain an independent medical opinion. Nor is there any evidence that had the plaintiff been so "informed" in August, 1970, his hospitalization in October of that year and his subsequent disability could have been avoided. In short, there appears to be no causal nexus between the defendant's failure to "inform" the plaintiff—even *assuming* that it had a duty to do so—and the fact or the extent of the plaintiff's disability. A jury verdict to the contrary can only be viewed as incompatible with the facts and the relevant law.

6. *The Defendant's Failure to Provide the Plaintiff With a Safe Place to Work.*

■ Virtually all of the foregoing claims and the discussion thereof are subsumed in the general allegation that the defendant negligently failed to provide the plaintiff a safe place to work. While the court's previously stated views need not be reiterated, two final points merit elaboration: (1) the extremely tenuous nature of the evidence that this particular plaintiff's disability was in fact *caused* by the conditions in the defendant's plant; and (2) the overwhelming evidence that the plaintiff's

disability, even if caused by the conditions in the defendant's place of work, was idiosyncratic in nature.

The sole suggestion of any causal relationship between the plaintiff's place of work and his disability arose in the testimony of his personal physician, Dr. Evans. Dr. Evans testified that (1) acknowledged experts in the fields of medicine and industrial hygiene concurred in the views that (a) the chemicals in the defendant's plant were below those levels that might present a health hazard and that (b) fiberglas dust was an inert material that did not produce significant organic disease or toxic effect at the levels present in the defendant's plant; (2) such views were worthy of respect and Dr. Evans himself respected them; and (3) the defendant was entitled, in operating its plant, to rely upon such views as representing the best information available from the medical standpoint. Notwithstanding this testimony, however, Dr. Evans concluded that the plaintiff's disability was caused by the conditions of his employment. This conclusion was substantiated exclusively by (1) Dr. Evans' personal "disagreement" (based upon undisclosed data) with the consensus of contemporary medical scientists; and (2) Dr. Evans' observation that different people have varying physical reactions to the same stimuli. In the court's view, Dr. Evans' conclusion that the plaintiff's disability was occupational is entitled to no credence or weight whatsoever. Indeed, this might truly be characterized as one of those rare cases in which "the evidence points but one way and is susceptible to no reasonable inferences" that would sustain the plaintiff's burden of proof on the issue of *causation.*

The court need not rest its decision solely on this ground, however, for the overwhelming weight of the evidence was that the plaintiff's disability, if it was indeed related to his employment, arose from his unique and peculiar susceptibility to harm. In this regard, our case is indistinguishable from *Allen v. Shell Petroleum Corp.,* 146 Kan. 67, 68 P.2d 651 (1937). The Kansas Supreme Court there noted that the fumes and gases in the defendant's plant were neither inherently poisonous nor present in dangerous quantities, and that no employee of the defendant—aside from the plaintiff—had ever suffered a lung ailment similar to that claimed by the plaintiff. The court in *Allen* rendered a statement of the law that is equally applicable to the case before us: "It was not the duty of the employer to anticipate a particular injury to an employee which very likely resulted by reason of the employee's peculiar physical condition, of which it had and could have had no notice." Here, as in *Allen,* the plaintiff's disability was neither foreseen nor reasonably foreseeable by the defendant, and the court cannot hold the defendant strictly liable for its failure to guard against or to prevent disability that a reasonable and prudent employer would not expect to happen. The court must therefore hold that the finding inherent in the jury's verdict—*i. e.* that the defendant negligently furnished the plaintiff an unsafe place in which to work—is absolutely unsupported by the overwhelming evidence in this case.

This case is in many ways analogous to *Robbins v. Alberto-Culver Co.,* 210 Kan. 147, 499 P.2d 1080 (1972), involving the alleged breach by a hair rinse manufacturer of an implied warranty that its product was suited and fit for the purpose for which it was sold. The Kansas Supreme Court, in defining the proper standard to be followed in ascertaining the manufacturer's liability for personal injuries occasioned by its products to persons who were allergic or hypersensitive to their use, made the following comments:

> "At the risk of seeming over-simplistic, we believe the concept of foreseeability is the key in determining liability on the part of one who manufactures or sells a fabricated product which causes an allergic reaction in a person who may be susceptible to it."

The Kansas Supreme Court therefore found in the implied warranty context that a manufacturer is not required "to assume the role of absolute insurer against physiological idiosyncrasy," or rendered liable for an isolated instance of personal injury to

"an unusually susceptible individual," unless such injuries "ought reasonably to have been foreseen by a person of ordinary care in an appreciable number of persons in the light of the attending circumstances." The compelling logic and inherent justice of this rule is equally applicable in the negligence case now before the court. To sustain the jury's verdict absent proof of reasonable foreseeability of the plaintiff's injuries would be to render the defendant here an insurer strictly liable for unexpected injuries arising from the peculiar idiosyncrasies and allergic predispositions of the plaintiff. Such a result would be consistent with neither the prevailing law nor the court's sense of fundamental justice. See also, *Ray v. J. C. Penney Co.,* 274 F.2d 519 (10th Cir. 1959).

### 7. Conclusion.

For all of the reasons stated above, the court finds that the defendant is entitled to prevail on its motion for judgment notwithstanding the verdict. This conclusion does not end the pertinent inquiry, however, for under Rule 50(c)(1) of the Federal Rules of Civil Procedure the court is also required to rule on the defendant's motion for a new trial, determining whether it should be granted if the judgment notwithstanding the verdict is thereafter vacated or reversed. It is to that question that the court now turns.

### II. MOTION FOR NEW TRIAL.

 The defendant argued at various points in the trial that the plaintiff's exclusive remedy, if any, was under the following provisions of· the Kansas Workmen's Compensation Act:

"K.S.A. § 44–5a01. *Occupational disease as injury by accident, when; provisions of workmen's compensation law applicable.* (a) where the employer and employee or workman are subject by law or election to the provisions of the workmen's compensation law, the disablement or death of an employee or workman resulting from an occupational disease as hereinafter listed and defined shall be treated as the happening of an injury by acci- · dent, and the employee or workman . . shall be entitled to compensation as pro-

vided in the workmen's compensation law except as hereinafter otherwise provided . . . .

"(b) Where an occupational disease is aggravated by any other disease or infirmity, not itself compensable, or where disability or death from any other cause, not itself compensable, but [*sic*] is aggravated, prolonged, accelerated or in any wise contributed to by an occupational disease, the compensation payable shall be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as such occupational disease, as a causative factor, bears to all the causes of such disability or death . . . ."

"K.S.A. § 44–5a02. *Compensable occupational diseases.* The following diseases only shall be deemed to be compensable occupational diseases:

"1. Poisoning by . . . (g) carbon monoxide; . . . (j) formaldehyde . . . ."

Based upon these statutes, as well as the plaintiff's theory that the synergistic reaction in the plaintiff's lungs of "chemicals" (formaldehyde, ammonia, and carbon monoxide) plus "heat" (from the blast furnace in the forehearth area) plus "dust" (airborne fiberglas particles) had caused the disability complained of, the defendant requested that the court instruct the jury as follows: "You, the jury, are not permitted to return a verdict in favor of the plaintiff in this case for any damages, if any, you find which may have been caused by formaldehyde or phenol or carbon monoxide." The court rejected the proffered instruction on two grounds: first, the defendant had failed to sufficiently show that the plaintiff's disability was caused by "poisoning" as that term was used in K.S.A. § 44–5a02; and second, that the defendant had failed to submit any evidence on which the jury could properly apportion the plaintiff's damages, if any.

Upon reviewing the record in this case in light of several Kansas cases defining "poisoning," the court is persuaded that its prior · view of the evidence was overly restrictive, and that the jury should have been

instructed to decide whether any of the plaintiff's disability arose from occupational "poisoning" and was thus within the exclusive purview of the Kansas Workmen's Compensation Act. As early as 1886 the Kansas Supreme Court observed that the word "poison" is "in common use in our language, [has] a well-settled meaning which is not local, and cannot be regarded as technical or peculiar." In *State v. Baldwin*, 36 Kan. 1, 12 P. 318 (1886), the court therefore held that, so far as the definition of "poison" was concerned, it was "proper for the court to aid and enlighten the jury by defining the words and giving their usual meaning and acceptation in common language." The court further approved use of the following dictionary definitions of "poison:" (1) any substance which, when introduced into the animal organization, is capable of producing morbid, noxious, or deadly effect upon it; and (2) any substance which, introduced in small quantities in the animal economy, seriously disturbs or destroys the vital functions. It was further noted that there are "many different modes in which poisons operate," and that included under the heading of "poisons" are "obviously . . . a vast number of bodies belonging to the mineral, vegetable, and animal kingdoms, some solid, others fluid, and others gaseous, and deleterious vapors and miasmata imperceptible to the senses." 36 Kan. at 20–21, 12 P. at 328–29. A similar approach to the definition of "poisoning" in a workmen's compensation context was expressly condoned by the Kansas Supreme Court in *Weimer v. Sauder Tank Company*, 184 Kan. 422, 337 P.2d 672 (1959). Accordingly, the jury in this case should have been informed of the substance of the relevant occupational disease statutes and instructed to determine whether any part of the plaintiff's disability was attributable to "poisoning" for which K.S.A. § 44–5a01 provided the exclusive remedy.

The principal reason why the court refused to give the defendant's proffered instruction was not its concern whether the plaintiff's disability was arguably due to "poisoning" under the relevant statute, but rather its concern that the defendant had presented absolutely no evidence on which the jury could rationally apportion the plaintiff's damages, if any, as to recovery for injury within and injury outside the scope of the Workmen's Compensation Act. The defendant—which relied entirely upon the proposition that the plaintiff's disability was 100% non-occupational in origin—presented no evidence from which the jury could find that among those occupational causes (if any) of the plaintiff's disability, any particular percentage of his difficulties could be attributed to "poisons" within the scope of the occupational disease statutes as opposed to other substances for which statutory compensation was not available.

In retrospect, the court is of the opinion that this failure of proof did not warrant its refusal to instruct the jury as to the arguable applicability of the exclusive remedial provisions of the workmen's compensation statute. The entire theory of the plaintiff's case at trial was that the *synergistic* reaction of "chemicals + heat + dust" produced the pulmonary disability for which relief was sought. The plaintiff disavowed the suggestion that any single component of this formula, or any combination of two such components, produced or could have produced the plaintiff's disability. With reference to the "chemical" component of his theory, however, the plaintiff's own evidence established a virtually *prima facie* case that (1) his disability was partially attributable to § 44–5a02 chemicals; and (2) the effect of such chemicals was "poisonous" in nature. In view of this evidence, which made out a *prima facie* case that the plaintiff's common law remedy was completely—or at best, partially—barred by the availability of workmen's compensation relief, it was incumbent upon the plaintiff to establish the nonexclusivity of the statutory compensation remedy as to each element of the injuries for which he sought common law relief. The defendant's requested instruction did not introduce as an "affirmative defense" the issue of § 5a01(b) apportionment as to the "heat" and "dust" elements of the plaintiff's theory. This issue was interjected into the case by the plaintiff himself. The defendant appeared willing, so far as the "heat" and "dust" facets of the plaintiff's case were concerned, to

rest upon the court's basic jury instructions that in order for defendant to be found liable, the plaintiff must prove negligence, causation, foreseeability of injury, etc. Accordingly, the defendant should not have been required, as a condition precedent to the giving of its proffered jury instruction, to introduce evidence purporting to assign a certain percentage of the plaintiff's disability to causes for which K.S.A. §§ 44–5a01 and 44–5a02 provided the exclusive remedy.

In deciding to conditionally sustain the defendant's motion for a new trial, in the event that the court's order granting the defendant's motion for judgment notwithstanding the verdict should be reversed upon appeal, the court does not mean to imply that the particular instruction proffered by the defendant adequately addressed all of the points that the court in retrospect feels should have been covered. The court merely holds that based upon the evidence in this case the jury should have been instructed (1) to determine to what degree, if any, the plaintiff's disability was caused by chemical "poisoning" within the purview of K.S.A. § 44–5a02(1)(g) or (j); and (2) to determine to what degree, if any, the plaintiff's disability was caused by conditions or substances beyond the scope of K.S.A. §§ 44–5a01 and 44–5a02. The jury should have been further instructed, if it found the plaintiff's disability to have been caused by both compensable and noncompensable factors, to render an appropriate apportioned verdict under K.S.A. § 44–5a01(b). As to the latter point, the jury should have been instructed as to who bore the burden of proving facts on which a rational apportioned verdict could be rendered.

It is perhaps appropriate to comment in closing upon the fact that in deciding the defendant's motion for judgment notwithstanding the verdict, the court did not rely upon the defendant's argument that all recovery whatever was barred by the availability of relief under the provisions of the Workmen's Compensation Act. In the court's view, it was not necessary to reach this issue, which is essentially a matter of affirmative defense, because of the total paucity of evidence probative of the basic elements of the plaintiff's case. If the court's evaluation of that evidence is in error and should its conclusion be reversed upon appeal, however, the court would be required to find that adjudication of the plaintiff's rights at common law vis-a-vis the exclusive remedial provisions of the Kansas Workmen's Compensation Act is properly a matter of jury determination under appropriate instructions.

IT IS THEREFORE ORDERED that the defendant's motion for judgment notwithstanding the verdict be and hereby is sustained, and that the defendant's motion for new trial be and hereby is conditionally granted in the event that the judgment to be subsequently entered in this case is hereafter vacated or reversed. Counsel for the defendant shall prepare, circulate, and submit for the court's approval and signature a Journal Entry of Judgment reflecting the holdings of the foregoing Memorandum and Order.