561 F.2d 183
 Nita YAZZIE, Administratrix of the Estate of Daniel Joseph
Yazzie, Deceased, Plaintiff-Appellant,
v.
John Herman SULLIVENT, H. J. Jeffries Truck Lines, Inc., and
Excel Insurance Company, Defendants-Appellees.
 No. 75-1619.
 United States Court of Appeals, Tenth Circuit.
 Argued and Submitted July 20, 1977.
On Rehearing Aug. 16, 1977.
 
 Benjamin S. Eastburn of Hynes, Eastburn & Hale, Farmington, N. M., for plaintiff-appellant.
 Jonathan W. Hewes and James C. Ritchie of Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, N. M., for defendants-appellees.
 Before BARRETT and DOYLE, Circuit Judges, and STANLEY,* District Judge.
 ON REHEARING
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This cause is before the court following the grant of rehearing. Oral arguments on rehearing have been held and the matter now stands submitted.
 
 
 2
 This wrongful death action was instituted by Nita Yazzie as administratrix of the estate of her deceased husband, Daniel Joseph Yazzie. Defendants in the case are John Herman Sullivent, H. J. Jeffries Truck Lines, Inc., and Excel Insurance Company. Sullivent was the driver of a tractor-trailer rig which allegedly struck the decedent, Daniel Yazzie, and dragged his body for approximately 18 miles and, of course, completely mutilated his body. All of this occurred on February 2, 1973, the body having been discovered about 9:00 p. m. on that date.
 
 
 3
 The evidence in the case shows that on February 2, 1973, Daniel Yazzie left his home near Shiprock, New Mexico, intending to travel to Window Rock, Arizona to withdraw funds from the Navajo Credit Union in order to purchase a roping horse. Yazzie was driving his son's 1963 Chevrolet between the two towns, a distance of 100 miles.
 
 
 4
 The evidence showed that Yazzie, the husband of Nita Yazzie, the plaintiff, was a married man with three children. He had received a Bronze Star Medal and a Purple Heart while in the military. He had also been an athlete and was in good physical condition. His job was with the Navajo Tribal Water Works Department, where he had been employed for 15 years and was a foreman at the time of his death. He had been presented with an award by the Navajo Tribe. In addition to his job, he had a ranch and farm on which he did the work on weekends and weekdays, mornings and evenings. He also assisted his parents in running their farm. Nita Yazzie testified that he would occasionally drink but not to great excess.
 
 
 5
 The incident which led to decedent's taking this trip was an effort on the previous day to take possession of the horse. On that occasion the owner insisted on full payment, so it was necessary for Yazzie to pay $50.00 down and seek the balance from the credit union. His son, Rudolph, testified to this and also to the fact that his father borrowed the 1963 Chevrolet from his brother in order to make the journey. However, when 4:00 or 5:00 p. m. came and his father was not home, he, Rudolph, called the police station in search of him, thinking that he was stranded and needed a ride. Also, the automobile was not too dependable. This 1963 car was found after the death a few miles north of Gallup and was inoperable.
 
 
 6
 The mentioned truck furnished mute evidence that the trailer had struck the decedent and had dragged him, as indicated above. Sullivent, the driver, was arrested after the discovery of the body. He was charged with and pleaded guilty to drunken driving. He claimed to have known nothing about any contact with the body of Yazzie. He did, however, testify that he had inspected the truck and had observed the blood on the undercarriage of the trailer after he was stopped by the police. At trial he testified that there were blood stains on the spare tire rack, the side board racks, and generally at the back end of the trailer. In his deposition he stated that there was blood splattered on the bumper guard and mud flaps. These indicated that the wheels had splattered it.
 
 
 7
 At 2:48 a. m. on February 3, 1973, Sullivent was taken to the Gallup Police Department Police Headquarters, where an alcohol test was administered. A blood sample taken was found by the chemist to have an alcohol content of .13%. The chemist said that a man of Sullivent's size would have had to drink at least eight beers in an hour's time to reach that level. On a full stomach, which Sullivent claimed he had (before he started drinking), the chemist testified that it would require about ten beers in an hour's time. A noteworthy fact is that Sullivent had left the bar before 9:00 p. m. and the test was administered at 2:48 a. m. This would have indicated that his blood alcohol at 9:00 p. m. would have been between .19% and .28%.
 
 
 8
 Dr. Weston, the chief medical investigator for the state, testified that a person having .10% or greater is considered to have impaired judgment and impaired reactions. With a blood alcohol level of .22% the individual is considered stupid drunk or comatose.
 
 
 9
 Testimony was given by a general practitioner, who was the county coroner in Gallup, concerning Yazzie. This physician said that he removed blood from the left ventricle of the heart, and that the alcohol content was .334%. Dr. Weston, the medical examiner, was asked about the accuracy of such a test and he said that in view of the fact that the heart of Yazzie had been found in the area of the stomach, there was a strong likelihood of contamination, which raised a question as to the validity of the finding. The reason is that when the heart is removed from its normal location, it is torn across one or several of the blood vessels which serve the chest cavity, and when those vessels are completely dislodged there is a resultant contamination.
 
 
 10
 The above-mentioned rig consisted of a tractor which was 15 feet long together with a flatbed trailer which was 40 feet long. Various evidences of its movements appeared on the highway.
 
 
 11
 The witness Samuels, a Navajo Tribal Policeman, made an investigation at about 9:00 p. m. on February 2, at which time he was called to the scene. The torso of the body of Yazzie was found on State Road 264 between Window Rock and Ya-ta-Hay Junction. Part of the torso was on the roadway and the remains were scattered along the highway towards the west. Samuels, together with one Stewart, a special investigator for the Window Rock Police Department, backtracked from the place where the body was found and were able to see marks on the highway showing where the body had been dragged. Samuels testified that he and Stewart found a sleeve 100 yards north of Eddie's Bar which is on Highway 666 on the east side of the road. This marked the beginning of the evidences of dragging and mutilation. Tire impressions were here found and the sleeve was discovered between the tire impressions. This was approximately two feet off of the pavement. It had drops of clotted blood and there was some blood on the sleeve. Samuels said that people were known to hitchhike from that area.
 
 
 12
 From the point just north of Eddie's Bar where the road turns to the left, the drag mark or blood trail started. This was approximately one-tenth of one mile north of where the sleeve had been found. The mark on the highway continued for approximately two or three miles to Gamerco, where there were railroad tracks.
 
 
 13
 From the railroad tracks north the drag marks were heavy or distinct, ranging from 12 to 24 or 25 inches in width, and continued down Highway 666 and appeared on State Road 264. There is a turnoff from Highway 264 to 666 and the truck took it. The turnoff merges into 264 at the eastbound lane, and at that point Samuels and Stewart found a hand. The blood trail continued down the road to the place where the remainder of the body was found. The trail of the truck was a weaving one from the place where the sleeve was found. Officer Samuels stated that "In some places it went off the side of the shoulder of the road, and in places it crosses the center lane on this side, and back onto the right-hand side of the road."
 
 
 14
 At the place where the sleeve was found, which is also the area where there is an inference that the decedent was hit by the truck or trailer, there are tracks arguably of the trailer which left the road at this point. The trail starts soon thereafter.
 
 
 15
 Appended to this opinion are photographs of the rig which depict the magnitude of this truck and trailer. The evidence established that to make a turn, such as that at the place where the sleeve was found, the tractor must swing wide. The rear wheels of the tractor will then track inside the rear wheels of the trailer. The latter wheels will leave the highway. The circumstances here indicate that the tractor and trailer in making this turn may have gone into the area where hitchhikers often wait for rides. From the evidence, it would appear that this is the place where the trailer probably caught the decedent.
 
 
 16
 The jury on April 30, 1975, returned a verdict in favor of Nita Yazzie in the amount of $75,000. The defendants then moved for judgment notwithstanding the verdict. This motion was granted by the court on May 29, 1975. The trial court did not write an opinion in connection with the granting of this judgment. It merely said that the evidence was insufficient to support it on the question of causation. The court did write a memorandum opinion when it denied the motion of plaintiff-appellant for a new trial. In that opinion it said:
 
 
 17
 Briefly, this is a wrongful death case in which plaintiff alleges that decedent's death was due to the negligent manner in which defendant Sullivent was driving his truck. The case was tried to a jury, which returned a verdict for plaintiff. On timely motion of defendants, judgment was granted notwithstanding the verdict in favor of defendants, pursuant to F.R.C.P. 50, on the grounds that, considered in the light most favorable to plaintiff, as a matter of law there was not sufficient evidence of causation to support the jury's verdict. At its most favorable, plaintiff's evidence showed that defendant Sullivent was driving his truck in a negligent manner, and that decedent's body came into contact with the truck and was dragged by the truck for a number of miles. There was no evidence to show how or why decedent's body came into contact with the truck, or even if decedent was alive at the time his body came into contact with the truck. In short, there was no evidence that decedent's death was proximately caused by defendant Sullivent's negligence.
 
 
 18
 Thus, the court's determination was that the defendant Sullivent was guilty of negligence; that decedent's body came into contact with the truck and was dragged by the truck for a number of miles. Notwithstanding the strong evidence of fault and the evidence that Sullivent caused the injury, the verdict was set aside for insufficiency because the evidence failed to show how or why the body contacted the truck.
 
 I.
 
 19
 The quantum of proof needed to establish a jury question as to whether the tortious conduct of the defendant has caused the harm to the plaintiff is discussed in Restatement of Torts Second § 433 B, comment b. The commentary is to the effect that the plaintiff need not prove his case beyond a reasonable doubt. In fact, "He is not required to eliminate entirely all possibility that the defendant's conduct is not a cause."
 
 
 20
 It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case.
 
 
 21
 It is sufficient then for submission to the jury if the evidence is such that it is more probable than not that the event was caused by the defendant. So tested, the facts here presented point to the defendant Sullivent as the responsible agent and there is no competing possibility capable of challenging this conclusion.
 
 
 22
 The Supreme Court of New Mexico has followed this reasoning in an often cited case, that of Lopez v. Townsend, 42 N.M. 601, 82 P.2d 921 (1938). In that case Lopez was found injured on a highway a few miles south of Santa Fe Plaza. His team of horses hitched to a wagon loaded with wood stood by unattended. He died from the injuries inflicted. The plaintiff's representative sought to prove that the defendants were driving their bus at a dangerous rate of speed and that they passed the decedent on the wrong side of the road and that the driver of the bus was intoxicated.
 
 
 23
 Lopez, like the instant case, was based on circumstantial evidence. The contention there, like that in our case, was that the liability of the defendant was based upon conjecture, but the Supreme Court of New Mexico disagreed. It determined that it was sufficient for the plaintiff to prove that Lopez was killed by being struck by a bus of the Scenic Stage, Inc., even though the exact happening could not be proved. Circumstances established that the wagon had been driving along the highway close to the right-hand edge of the highway for some distance and following the impact had veered to the left. A pool of blood was found 26 feet from the point where the wagon had veered to the left. There was broken glass from the headlight a few feet from the pool of blood. There were tracks to the right of the place where the wagon had been, made by a tire. The bus was discovered later in a nearby town. The damages to it attested to the collision. It was inferred from the evidence that the decedent was hit because of the drunkenness of the driver and because of his passing on the wrong side. All of this derived from circumstances. Nevertheless, the court said that plaintiff in this kind of case is not required to establish the facts beyond a reasonable doubt; that it was sufficient that a man of reasonable mind could conclude that there was a greater probability the accident causing the injury happened in a way which fixed liability on the person charged rather than that it happened in a way which absolved him.
 
 
 24
 The rule thus adopted by the New Mexico court is like the Restatement comment. Applied to our case, the probability that the injury and death were caused by the negligence of the defendant is a much stronger probability than any contrary inference. In fact, in the instant case no positive or affirmative inferences arise; only possible doubts can be argued. The drunkenness, the erratic driving, together with failure to discover or be aware of any possible injury to the decedent, are conclusions which fairly arise from the basic facts.
 
 II.
 
 25
 In the case at bar we are reviewing the order of the trial court setting aside a jury verdict and entering judgment NOV for the defendant. In taking this action the trial court was saying in effect that there was insufficient evidence to allow the case to be submitted to the jury in the first place.
 
 
 26
 Charles Alan Wright in his Law of Federal Courts has cited a series of Supreme Court decisions reversing judgments of lower courts which have taken away from the jury cases arising under Federal Employers' Liability and Jones Acts. The Supreme Court has held that so long as there is evidence from which an inference might rationally be drawn as to how the accident happened or whether defendant's conduct was negligent, it is for the jury to accept or reject the inference even though it may be improbable and even though some conflicting inference is highly probable. Citing Lavender v. Kurn, 327 U.S. 645, 652-53, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P.U.R. Company, 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520; Rogers v. Missouri Pacific Railroad Company, 1957, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493. Wright says that these holdings are not confined to FELA and Jones Act litigation since the cases refer to the jury's historic function and to the Seventh Amendment. Also, the Supreme Court has cited these cases as representing the "federal test of sufficiency of the evidence to support a jury verdict where federal jurisdiction is rested on diversity of citizenship." Citing Dick v. New York Life Insurance Company, 1959, 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935; Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 696 n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777.
 
 
 27
 The question of sufficiency of evidence to create a jury issue is regarded as a federal question to be determined by federal law, where federal law differs from state law. See Dick v. New York Life Insurance Company,supra, and Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 1958, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953. The authors at 9 Wright and Miller, Federal Practice and Procedure, p. 542 et seq., state that the motion for judgment NOV is judged by the same standard as the motion for a directed verdict. The question in each instance is not whether there is no evidence supporting the party against whom the motion is made, but whether there is evidence upon which the jury could probably find a verdict for that party. The court is not to weigh the evidence or pass on the credibility of the witnesses or substitute its judgment for that of the jury. Rather, it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. The philosophy of this doctrine is that there must be a minimum of interference with the jury. If the evidence of the party against whom the motion for judgment NOV is substantial, the motion should not be granted. Some cases say that the evidence is sufficient if there is any evidence supporting a party's case. This is said by Wright and Miller to be incorrect since more than a scintilla of evidence is required.
 
 
 28
 In our case the evidence presented meets the test enunciated. All of the basic facts point to the probability that the negligence of the individual defendant, the truck driver Sullivent, was the cause of the injury and death of the decedent. In view of this, it was error for the trial court to grant the motion in the dearth of evidence contradicting the mentioned inference. In truth, there is no conflicting evidence. We view the speculations as to possibilities such as the decedent being dead when he was caught up by the trailer or that he had crawled into the spare tire rack as being no more than guesses or speculations.
 
 
 29
 Our conclusion is that the trial court was correct the first time when it submitted the case to the jury. It was error, in view of the evidence, for the court to set aside the jury's verdict.
 
 
 30
 Accordingly, the judgment is reversed and the case is remanded to the district court with directions to vacate its order setting aside the jury verdict. The court is further directed to reinstate the judgment in favor of the plaintiff-appellant based upon the verdict of the jury.
 
 APPENDIX
 
 31
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 BARRETT, Circuit Judge, dissenting:
 
 32
 I respectfully dissent. The record does not contain the preponderance of the evidence required to support the plaintiff's recovery. The most that can be said for the "contention" of plaintiff in support of the jury verdict relating to the issue of proximate cause is simply that the contention may be correct. The record, however, supports the defendants' contention that proximate cause is not established. For some unexplained reason, no expert testimony was presented by plaintiff on the critical issue of causation. Such evidence, it seems, was required in order to at least arguably prove plaintiff's "contention" of proximate cause. In lieu thereof, we have only the "guesswork" and "conjecture" of counsel for Yazzie that the decedent's body was in some manner "snagged and dragged" by the trailer.
 
 
 33
 At oral argument, counsel for Yazzie contended that evidence in the record supports a finding that Yazzie's body was "snagged and dragged" by the trailer of the tractor-trailer vehicle being operated by Sullivent at a point adjacent to a curve where Sullivent negligently drove the vehicle some 15 feet off of the hardtop and then, by means of a sharp left turn, swung the vehicle back onto the hardtop. The "guess" and "conjecture" is that Yazzie was walking within two feet of the edge of the hardtop facing toward the tractor-trailer when he was "snagged" by the rear portion of the trailer as it swung back onto the hardtop. The body was presumably "dragged" from that point. This predicate rests almost exclusively on the proposition that a portion of Yazzie's shirt sleeve was found between two tire imprints at this point. I submit that such is simply not adequate to satisfy the law of causation. And there are just no other "facts" from which any inferences may be drawn to support the "contention."
 
 
 34
 If Yazzie's body was "snagged" at the point contended by plaintiff, one must ask why nothing was found there except a part of a shirt sleeve and a few spots of dried blood? I submit that if his body was struck by the trailer at this point, the force of the impact would have been devastating. If Yazzie was upright at the point of impact, the outside left rail of the trailer would have struck his body as the trailer was "swinging" sharply and abruptly leftward toward the hardtop. Would not the force and direction of that movement have violently "tossed" Yazzie's body onto the hardtop? And how could Yazzie's body have been "swept up" or "snagged" if his body was in a "crouched" position at impact? Certainly, it would have been "smashed" by the left rear wheels or tires. It seems inconceivable that there would not have been a resultant smashed and broken body quite discernible at the area of impact.
 
 
 35
 The plaintiff did not present expert testimony in support of her "contentions." This is a cause and effect case. While the law does not demand absolute proof, I submit that here the jury was required to pile inference upon inference to arrive at the result reached.
 
 
 36
 The law of New Mexico is that a reasonable inference is a conclusion arrived at by a process of reasoning from facts established which lead to a logical hypothesis, and that if the facts established by the evidence are equally consistent with two hypotheses, then these facts do not prove either. Waterman v. Ciesielski, 87 N.M. 25, 528 P.2d 884 (1974); Gray v. E. J. Longyear Company, 78 N.M. 161, 429 P.2d 359 (1969); Lovato v. Plateau, Inc., 79 N.M. 428, 444 P.2d 613 (1968); Tapia v. Panhandle Steel Erectors Co., 78 N.M. 86, 428 P.2d 625 (1967); Hughes v. Walker, 78 N.M. 63, 428 P.2d 37 (1967); Renfro v. J. D. Coggins Co., 71 N.M. 310, 378 P.2d 130 (1963); DeBaca v. Kahn, 49 N.M. 225, 161 P.2d 630 (1945); Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640 (1940); Anno., 8 A.L.R.3d 974, 992.
 
 
 37
 I would affirm.
 
 
 
 *
 Of the District of Kansas, sitting by designation