Nancy BROWN, Plaintiff-Appellee,

v.

McGRAW–EDISON COMPANY, a corporation; the American Laundry Machinery Company, a division of McGraw-Edison Company, a corporation; and the American Laundry Machinery Company, a corporation, Defendants-Appellants.

No. 81–1599.

United States Court of Appeals, Tenth Circuit.

June 1, 1984.

Glen Mullins, Oklahoma City, Okl. (Abel, Musser, Sokolosky & Clark, Oklahoma City, Okl., Ed Abel, Oklahoma City, Okl., was also on brief), for plaintiff-appellee.

J. Warren Jackman, Tulsa, Okl. (Pray, Walker, Jackman, Williamson & Marlar, William D. Lunn, Tulsa, Okl., was also on brief), for defendants-appellants.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and ARRAJ, District Judge.*

HOLLOWAY, Circuit Judge.

Defendants McGraw-Edison Co. and its division, the American Laundry Machinery Co., appeal from an adverse judgment in a products liability action brought by plaintiff Nancy Brown, based on personal injuries she sustained when her hand became caught in a commercial laundry ironer manufactured by American Laundry.

On appeal defendants claim that (1) the trial court erred in refusing to grant defendants' motions for a judgment notwithstanding the verdict and for a new trial since the evidence was overwhelming that the product had been substantially altered after it left the manufacturer's hands; (2) the trial court erred in ruling that excessive coasting of the rollers was an inherent defect in the machine when the uncontroverted evidence was that such condition did not exist in the machine as originally manufactured. We affirm.

### I

The ironer involved in this lawsuit, the American Standard Six-Roll Flatwork Ironer, is a large ironer used in commercial cleaning establishments. The operator of the ironer feeds the garments into a feeder belt which carries the garments through a series of six large, steam-heated rollers which press the garments against a truncated steam chest.

At the time of her injury, Brown was an employee of Stillwater Laundry in Stillwater, Oklahoma. IV R. 4. She had been working at the laundry for only two days, and on the ironer in question for approximately fifteen minutes. *Id.* at 4–5. While attempting to straighten out a wrinkle in a hospital gown which she was feeding into the ironer, her right hand became caught in the gown and was pulled into the hot rollers on the machine. As a result of this incident, Brown's hand was badly burned and three fingers had to be amputated.

Brown brought this products liability action, claiming that the ironer was defective in two respects. First, the electrical shut-off mechanism on the machine was designed and manufactured in such a manner that the rollers on the ironer would continue to coast approximately twelve inches after the machine was shut off, allowing plaintiff's hand to be pulled into the machine and thereby causing her injury. And second, the machine in question did not have a cover over the feeder belt area which would have prevented plaintiff from putting her hand into the ironing mechanism of the machine.

At trial defendants did not dispute that the machine on which plaintiff was injured, involving the electrical shut-off system, was unreasonably dangerous. Rather, they presented testimony seeking to show that the ironer, as originally designed and manufactured, had a *mechanical* safety device, not an electrical one, which disengaged the rollers very quickly, bringing them to a stop within one inch. Defendants insisted that they could not be held liable for third-party alterations rendering the product defective and that there was no purpose to a safety cover over the feeder belt, given the presence of the original mechanical safety device.[1]

---

* The Honorable Alfred A. Arraj, of the District of Colorado, sitting by designation.

1. The date of manufacture of the machine was a question of much uncertainty at trial. Johnny Manasco, the plant manager, testified that the American machines used at his facility were vintage 1927 or 1928 machines, IV R. 69, while Ralph Barnett, defendants' expert, could not say that the machine on which plaintiff was injured was a 1927 machine as opposed to a later model. *Id.* at 239. On appeal, plaintiff states only

Following a five-day trial to the jury, Brown was awarded damages in the amount of $125,000. Defendants moved for a judgment n.o.v. or a new trial, and the trial court denied both. In overruling these motions, the court observed that defendants presented a "powerful argument" in support of their motions and that "if this case had been tried to the court without a jury a different result may have been obtained ...." I R. 197. The court commented that there was "overwhelming evidence indicating some modifications with respect to the electrical [safety device] ..., [but] the plaintiff ably argues in her response that the matter of the machine coasting after it shut-off is a defect that was inherent and that no modification or change in the switch or electrical wiring or extra guards or any other changes would have anything to do with this defect." *Id.* at 197–98. The court stated that "the jury was properly instructed on this matter and apparently chose to believe that the changes in the machine did not alter the original situation insofar as proximate cause of this accident is concerned." *Id.* at 198.

This appeal followed.

## II

Defendants argue that the trial court erred in refusing to grant their motion for a judgment n.o.v. Relying on *Franklin v. Skelly Oil Co.*, 141 F.2d 568 (10th Cir. 1944),[2] *inter alia*, they assert that plaintiff's evidence relating to product alteration by defendants was essentially based on "an attenuated string of palpably unreasonable speculations" by plaintiff's "expert," George Greene. Brief of Defendants/Appellants 23, 34.

Defendants say that Greene testified about a machine that he knew virtually nothing about, as shown by his failing to know that there were no bottom rollers on the machine; that he never bothered to investigate whether other manufacturers may have produced replacement parts for the ironer; that he admitted that the parts manual used by the laundry for ordering parts for the machine did not include any electric shut-off switch parts; and that the assumption that the replacement parts which injured plaintiff were manufactured by defendants was contradicted by overwhelming evidence in the record.[3] Defendants accordingly argue that plaintiff's evidence relating to product alterations by defendants was insufficient to raise an issue of fact for a jury. They say that the trial court's statement acknowledging the "overwhelming" evidence of modifications to the machine corroborates their argument.

■■■ In this diversity action, the required strength of the evidence to warrant a judgment n.o.v. is governed by federal law. *Yazzie v. Sullivent*, 561 F.2d 183, 188 (10th Cir.1977). The standard for determining whether to grant a motion for a judgment n.o.v., as for a directed verdict, is

---

that the machine on which she was injured was "manufactured by American Laundry sometime during the 1920's or 1930's." Response Brief of Plaintiff/Appellee 1.

**2.** In *Franklin* we stated:

The verdict of a jury must be based upon something more than mere speculation and conjecture. It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities, nor can the theory itself furnish the deficiency; the evidence must bring the theory to the level and dignity of a probable cause.
141 F.2d at 570–71.

**3.** For example, defendants say that Johnny Manasco, the plant manager, admitted that he had

never seen American's name on any of the replacement parts for the modified electrical shut-off system nor, in the almost forty years he had been around the machines, had he ever ordered any parts from the defendant manufacturer relating to the electrical switch modifications. They also say the testimony of their expert, Ralph Barnett, who had studied more than 150 American Six machines, was that the modified electrical shut-off system was not part of the original machine and was never produced by defendants. And finally, they recite the testimony of Ross Gerling, a retired employee of American Laundry who began working for the company in 1927 and rose to managerial status. Gerling testified that the company never approved any modifications designs to the original clutch-activated mechanical safety system.

not whether there is literally no evidence to support the party opposing the motion, but whether there is evidence upon which the jury could properly find a verdict for that party. *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498–99 (10th Cir. 1984). The court may not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury. *Yazzie v. Sullivent*, 561 F.2d at 188. Rather, it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. *Id.* On appeal, we employ the same standard of review as does the trial court. *Joyce v. Atlantic Richfield Co.*, 651 F.2d 676, 680 (10th Cir.1981).

Although the sufficiency of the evidence is tested against the federal standard, the underlying cause of action in a diversity case is governed by state law. *Peterson v. Hager*, 724 F.2d 851, 854 (10th Cir.1984) (opinion on rehearing). Under Oklahoma law a plaintiff suing on a theory of manufacturers' products liability must prove (1) that the product was the cause of the injury; (2) that a causally related defect existed in the product at the time it left the manufacturer's possession and control; and (3) that the defect rendered the product unreasonably dangerous to the plaintiff or his property. *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okl.1974); *see also Barber v. General Electric Co.*, 648 F.2d 1272, 1276 (10th Cir.1981). Unreasonably dangerous means " 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' " *Kirkland*, 521 P.2d at 1362–63 (quoting Restatement (Second) of Torts § 402A comment g).

As noted, plaintiff claimed at trial that her injuries were caused by two defects in the ironer: first, the product was equipped with an electrical safety device that was defectively designed and manufactured in that once it was activated it permitted the rollers to continue their momentum long enough to allow a hand to be drawn into the rollers; and second, the product was defective because it had no safety cover over the feeder belt area to prevent the operator from putting her hands into the ironing mechanism. Defendants principally challenge the evidence in support of plaintiff's first theory of recovery. However, their contentions do address both theories of recovery and we therefore discuss both as well.[4]

First, on the question of the defective shut-off device, there is no doubt that the product caused plaintiff's injuries or that the device rendered the product unreasonably dangerous. Indeed, both plaintiff's and defendant's experts agreed that the electrical shut-off device, once activated, could not stop the coasting of the machine in time to prevent a hand such as plaintiff's from being drawn into the machine.[5] IV R. 106, 178–79, 241. The only matter in dispute is whether the defect complained of existed in the machine at the time that it left the manufacturer's possession and con-

---

**4.** We note, however, that if there is evidence reasonably tending to support any of plaintiff's theories of liability, a motion for a judgment n.o.v. or a directed verdict must be denied. *See, e.g., Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 178 (3d Cir.1976); *Rochester Civic Theatre, Inc. v. Ramsay*, 368 F.2d 748, 752 (8th Cir.1966); *Vareltzis v. Luckenbach Steamship Co.*, 258 F.2d 78, 80 (2d Cir.1958); *Clark v. McNeill*, 25 F.2d 247, 248 (6th Cir.1928).

**5.** The electrical shut-off device consisted of a safety guard or gate resting across the front of the machine some seven inches before the nearest roller. IV R. 99. When pushed, the safety guard would trip an electric switch that would

turn off the electricity that powered the machine. *Id.* at 203, 211. Once the electricity was turned off, the inertia of the machine would cause the rollers to continue to travel as much as twelve inches or more. *Id.* at 99, 211. This excessive travel would permit a hand caught in a cloth to be pulled into the machine. *Id.* at 100.

Although defendants sought to establish at the trial below, and mention again in their brief on appeal, that there was evidence indicating that there was no safety guard at all on the ironer at the time of her injuries, defendants do not rely on this argument in their briefs before this court.

trol.[6] Defendants insist that the original mechanical shut-off system was replaced by an electro-switch shut-off not manufactured by defendants, while plaintiff contends that such modification was made by defendants, apparently conceding that such a modification was made. Response Brief of Plaintiff/Appellee 10–11.

■ We conclude that plaintiff's evidence, and the reasonable inferences to be drawn therefrom, are sufficient to create an issue of fact on the product alteration question. Johnny Manasco, the manager of the Stillwater Laundry at the time of plaintiff's injury, testified that he had probably seen twenty-five or thirty American Standard Six-Roll Ironers in various plants since 1942, and that they all were equipped with electrical shut-off devices like the one involved in this litigation. IV R. 49, 51. He also acknowledged that the machine on which plaintiff was injured had not been changed in any way after it had been received by his laundry. *Id.* at 44.

George Greene, plaintiff's safety expert, testified that during the course of his investigation he had examined five or six American Six-Roll Ironers, and that in his opinion the electrical safety equipment was manufactured by American Laundry. *Id.* at 95–96, 108, 119. He derived this opinion in part from the use of castings in the safety equipment.[7] A further basis for

---

**6.** This is part of the second element that plaintiff must prove under *Kirkland, supra.* The district court properly instructed the jury on this element, stating that "[p]laintiff must establish by a preponderance of the evidence ... [t]hat the defect complained of existed in the ironer at the time it left the defendants' possession and control." I R. 87. However, in continuing its instructions, the court also told the jury that:

> [T]he defendants have affirmatively alleged that third parties modified, altered or otherwise changed the design and nature of the ironer and that such modifications, alterations or changes were the cause of the accident. As to this affirmative defense, you are reminded that it is the defendants who have the burden of proving it by a preponderance of the evidence.

*Id.* at 89. The court apparently based this latter instruction on defendants' answer, which alleged that "the safety mechanisms on the ironer involved in the occurrence giving rise to this action were not in the same condition as manufactured by these Defendants, but had been substantially altered and changed." *Id.* at 5.

Although these burden of proof instructions may be inconsistent, the record shows that defendants failed to make a specific and timely objection pursuant to Fed.R.Civ.P. 51. *See* IV R. 333–34. Accordingly, any errors in the court's instructions would justify reversal only if they are "patently plainly erroneous and prejudicial." *Moe v. Avions Marcel Dassault—Breguet Aviation,* 727 F.2d 917, 924 (10th Cir.1984); *see also Fabian v. E.W. Bliss Co.,* 582 F.2d 1257, 1260 (10th Cir.1978) ("In civil cases only rarely will we review error when a specific objection was not made at trial."); *Prebble v. Brodrick,* 535 F.2d 605, 612 (10th Cir.1976) ("Although [appeals] court has the power to consider errors to which no objections were made, it is used sparingly and only in the interest of justice."). And although an appellate court may, on its own motion, notice errors to which no exception has been taken, it may do so only in "exceptional circumstances." *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

In the instant case, as noted, there was no objection to the instructions on the burden of proof as to defendants' allegation of modification, IV R. 333–34, and there is no challenge on appeal to that instruction. The plaintiff's burden of proof on the basic elements of a manufacturer's products liability case in Oklahoma is established, but we find no clear Oklahoma ruling that such an instruction as the trial judge gave here on the defendants' burden of proving alteration by a third party was error. *Cf. Santine v. Coca Cola Bottling Co.,* 591 P.2d 329, 333 (Okl.App.1978) (opinion in sealed container case published by Court of Appeals and persuasive but not binding precedent). Here there was a close case on the plaintiff's theory of a defect in the electrical braking mechanism. However, the additional theory of the lack of a covering guard to protect the operator's hands was also urged and not too effectively rebutted. If we were convinced that an error in the instructions resulted in a miscarriage of justice, even without an objection below we should order a new trial. *Sheppard Federal Credit Union v. Palmer,* 408 F.2d 1369, 1371 (5th Cir.1969); *see also G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 954–55 (5th Cir.1981) (where erroneous burden of proof instruction is given, plain error test is whether evidence is "very close"). Viewing the instant case with the two theories of recovery as a whole, and having no clear Oklahoma precedent that error was committed in the charge, we will not disturb the judgment.

**7.** Greene testified as follows:

> Q.—What can you tell us about that equipment?
> A.—I can tell you that in my opinion, that is factory installed equipment and that is based

Greene's opinion was that the electrical systems on all the ironers he had examined were identical. *Id.* at 118–120. This indicated to him that the parts came from a common source. *Id.* at 120.

On appeal, defendants sharply attack the credibility and testimony of Greene, stating that "[t]he only conclusion that can be reached, as a matter of law, is that Greene was an imposter charading as an expert and testifying about a machine he knew virtually nothing about." Brief of Defendants/Appellants 26. They also stress conflicting testimony presented by Ralph Barnett, defendants' expert, and Ross Gerling, a retired American Laundry employee, to the effect that the modification to the ironer was not performed or approved by American Laundry. *See supra* note 3.

In reviewing the grant or denial of a motion for a judgment n.o.v., we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. *Yazzie v. Sullivent,* 561 F.2d at 188. Rather, we must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences. *Id.* In that light the evidence presented at trial was such that a question of fact existed as to who made the alteration on the ironer. The testimony of Greene and Manasco tends to show that the ironer's defective safety device was made a part of the ironer by defendants, despite the contradiction by Barnett and Gerling. In these circumstances, we feel that the trial court properly submitted the product alteration issue to the jury.

With regard to plaintiff's second theory of recovery—the lack of a safety cover—plaintiff adduced similar evidence of a design defect to make the question one of fact for the jury. First, plaintiff showed that the product caused her injuries. *See* IV R. 5–7. Second, the testimony of plaintiff's expert witness established there was a design defect in the product at the time it left the manufacturer's hands.[8] Third, the testimony of plaintiff's expert, when taken as a whole, also demonstrated that the product was unreasonably dangerous un-

---

upon the type of castings that are utilized to make up the fence guard and the actual piece that involves the safety switch. It goes down to a pivot point and there is a casting that contains that part and examining the casting that I saw did not show any areas where other parts would come out of it. In other words, it looks like it was made to fit that exact type of guard and since it's a cast part, that is a production item, it's not something that, you know, someone would make even two or three hundred of. You know, it would be several thousand probably.

Q.—Well, by cast part now, for those of us that are not familiar with the manufactured process, how do you make a cast part, what do you mean when you say a cast part?

A.—Well, the casting I'm referring to is the part that goes—Well, a casting on the very top where we see the red switch there, see (Indicating) that rod on top there (Indicating), is a casting. Down at the bottom there are castings that connect the straight rod that goes through and the upper rod, which allows it to pivot back and forth. A casting is a production type operation, so you want to make a lot of parts just exactly alike, making them inexpensive as possible, you cast them. It is not something—But, it costs a lot of money to set up to make castings, if you're only making a

few, so anytime you're making a casting, which means, you know, a steel part that has been poured out of molten steel, that indicates a high production type of item.

Q.—That would mean later items made in that same casting could be fit on this same machine?

A.—That's correct.

Q.—Is that correct?

A.—That's correct.

Q.—All right. Then, that helps a manufacturer if they can supply replacement parts, to be able to sell replacement parts for that machine, doesn't it?

A.—Sure.

Q.—And, it makes the machine more marketable in the very first instance?

A.—In high production, it cuts the cost of parts, casting is the cheapest way to make them, if you have high production.

IV R. 102–03.

8. George Greene testified that, on the machines that he had examined, there was no covering over the feeder belt to keep an operator's hands totally away from the area of the rollers. IV R. 104. Defendant's expert, Ralph Barnett, also stated that American does not incorporate the fixed barrier guard in its designs. *Id.* at 255.

der Oklahoma law.[9] Defendants' expert witness, although acknowledging that another company placed a safety cover on similar machines, *id.* at 255, disputed the additional safety benefits in providing such a cover.[10] However, the credibility of opinion testimony, and the weight to be given it, are for the jury. *Huddell v. Levin,* 537 F.2d 726, 737 (3d Cir.1976); *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.,* 519 F.2d 634, 642 (8th Cir.1975).

We hold that the evidence was sufficient to support a jury verdict in plaintiff's favor under either theory of recovery, and that the trial court properly denied defendants' motion for a judgment n.o.v.

### III

Defendants further argue that the trial court erred in denying their motion for a new trial. Reciting much of the evidence in support of their motion for a judgment n.o.v., defendants assert that the evidence was "overwhelming" that no modification to the clutch-activated safety system had ever been approved by defendants. They

also point to the trial court's own language that the evidence was "overwhelming" that modifications to the original machine had been made.[11] Under these facts, they argue that they meet the high standard for reversing a trial court's denial of a motion for a new trial.

A motion for a new trial made on the ground that the verdict of the jury is against the weight of the evidence normally presents a question of fact and not of law and is addressed to the discretion of the trial court. *E.g., Harris v. Quinones,* 507 F.2d 533, 535 (10th Cir.1974); *Community National Life Insurance Co. v. Parker Square Savings & Loan Association,* 406 F.2d 603, 605 (10th Cir.1969); *Champion Home Builders v. Shumate,* 388 F.2d 806, 808 (10th Cir.1967). On review, we will not disturb the denial of a motion for a new trial unless there is a showing of a manifest abuse of discretion. *Walter v. Warner,* 298 F.2d 481, 484 (10th Cir.1962). The standard we use in determining this is whether the verdict is "clearly, decidedly, or overwhelmingly" against the weight of

9. Plaintiff's expert testified:

Q.—(By Mr. Abel) Mr. Greene, let me ask you, in your opinion, if such a system should be designed or would it be safer to any extent if that type of machine had that type of safety guard on it?

. . . .

[A.]—THE WITNESS: Yes, sir. The only way that you could make this machine to keep from tearing up your hand there is to have a spacing of sufficient length so the machine would stop before your hand would get to the roller basically, so, you need to have a guarded area of some length.

Q.—(By Mr. Abel) All right. And, then, would that serve the purpose of making sure that the person's hand didn't ever get up to the area of the roller?

A.—That's correct, sir.

Q.—All right. In your opinion, would that be a safer design?

A.—Oh, absolutely, sir.

*Id.* at 104–05.

10. Defendants' expert stated that a fixed guard would tear an operator's hand off if it were not interlocked. *Id.* at 255, 257.

11. The trial judge stated in part in his order denying the motion for a judgment n.o.v. or for a new trial that:

I frankly believe that if this case had been tried to the court without a jury a different result may have obtained but it is with extreme reluctance that a jury verdict is set aside when there is competent evidence to support it. Most authorities hold to the effect that a new trial should be granted only when the evidence is overwhelmingly balanced against the jury's finding, which is not this case. It is not sufficient that another verdict would have been more reasonable. In this case, although it seems to me that there was overwhelming evidence indicating some modifications with respect to the electrical wiring and switching mechanism in the ironer, the plaintiff ably argues in her response that the matter of the machine coasting after it shut-off is a defect that was inherent and that no modification or change in the switch or electrical wiring or extra guards or any other changes would have anything to do with this defect. I think the jury was properly instructed on this matter and apparently chose to believe that the changes in the machine did not alter the original situation insofar as proximate cause of this accident is concerned. I R. 197–98.

the evidence. *Champion Home Builders v. Shumate,* 388 F.2d at 808; *Locke v. Atchison, Topeka & Santa Fe Railway,* 309 F.2d 811, 817 (10th Cir.1962); *see also Prebble v. Brodrick,* 535 F.2d 605, 617 (10th Cir.1976) (no abuse of discretion found when verdict was not "clearly or overwhelmingly" against weight of evidence). *See generally* C. Wright & A. Miller, 11 *Federal Practice & Procedure* § 2819, at 121–22 & n. 59 (1973).

■ We are not convinced that the verdict of the jury was clearly, decidedly, or overwhelmingly against the weight of the evidence. Regardless of any confusion in the trial court's analysis, we are satisfied that there was sufficient evidence for the jury to find that the defective electrical shut-off device was manufactured by defendants, or that a safety cover over the feeder belt should have been provided. Defendants presented considerable evidence to the contrary and the jury could easily have found against the plaintiff. Nevertheless, we feel that the evidence in defendants' favor was not so strong that it was an abuse of discretion to accept the jury's verdict and to deny a new trial.

## IV

■ Finally, defendants contend that, in overruling their post-trial motions, the trial court "erred in ruling that the American Laundry machine had 'a defect that was inherent.'" Brief of Defendants/Appellants 14 (quoting trial court's order). Defendants argue that this "ruling" is erroneous because undisputed evidence at trial showed that the original mechanical safety device permitted almost no coasting of the rollers. Defendants note that the mechanical safety device was located seven inches from the first roller; they reason that with the original device in place, coasting of one inch at most would pose no threat to the operator. Therefore, defendants argue that the trial court erred in "ruling" that the product's defect was in-

herent from its inception. They assert that this error affects the substantial rights of the parties under Fed.R.Civ.P. 61 and that a new trial must be granted.

We cannot agree that the trial court "ruled" that the ironer in question had an inherent defect. The judge did state that the plaintiff ably argued that the defect of the machine coasting after it was shut off was "inherent." *See supra* note 11. The court's comments are confusing and apparently mischaracterize the plaintiff's position; the plaintiff did not assert that the original ironer with the mechanical shut-off mechanism was inherently defective. Rather, in her response to defendants' post-trial motions, plaintiff set out the testimony at trial which tended to show (1) that defendants manufactured the defective electrical shut-off device which permitted coasting of some twelve inches; and (2) that the ironer as designed and manufactured by defendants was defective because it failed to have a safety cover over the feeder belt area. I R. 192. Nevertheless, it is apparent from the remainder of the trial court's order that the court considered both the arguments in support of, and in opposition to, the post-trial motions, and that based on the "formidable line of authorities and ... much relevant evidence that militate[d] against the granting of the motion," *id.* at 197, the court concluded that the motions should be overruled. Thus, we do not find defendants' substantial rights to have been affected.

AFFIRMED.