**FARMERS INSURANCE COMPANY, INC., a foreign insurance company; Farmers Insurance Exchange, a foreign insurance company; Truck Insurance Exchange, a foreign insurance company; Fire Insurance, a foreign insurance company; Mid–Century Insurance Company, a foreign insurance company; Farmers New World Life Insurance Company, a foreign insurance company, Plaintiffs–Appellants,**

v.

**Homer H. HUBBARD, Defendant, Counterclaimant–Appellee.**

No. 87–1659.

United States Court of Appeals, Tenth Circuit.

March 10, 1989.

█

Frederic D. Cohen (David M. Axelrad of Horvitz & Levy, Encino, Cal.; Jones, Givens, Gotcher, Bogan & Hilborne, Tulsa, Okla., Robert E. Nagle of Farmers Group, Inc., Los Angeles, Cal., with him, on the briefs), for plaintiffs-appellants.

James S. Steph, Okmulgee, Okl., for defendant, counterclaimant-appellee.

Before ANDERSON, BARRETT and BRORBY, Circuit Judges.

BARRETT, Senior Circuit Judge.

This is an appeal by plaintiff-appellant, Farmers Insurance Company, Inc., et al. (Farmers), from the district court's denial of Farmers' motion for judgment notwithstanding the verdict or, alternatively, a new trial. Farmers brought this action for a declaratory judgment of the rights and duties of the parties relative to the agency contract termination of defendant-appellee, Homer Hubbard (Hubbard). For trial purposes, the parties agreed that the issue to be decided was whether Farmers exercised bad faith in terminating Hubbard; thus the burden was on Hubbard to prove bad faith.

At the conclusion of the trial, the jury rendered its unanimous verdict finding that Farmers had terminated Hubbard's agency contract in bad faith. The jury awarded Hubbard actual damages of $100,000.

### Background

Hubbard became a full-time insurance agent for Farmers in March, 1976. Pursuant to that agency, Hubbard signed an Agent Appointment Agreement which set forth various grounds for termination, including a willful misrepresentation material to the agency. Gary Vest was Hubbard's district manager. As district manager, Vest's responsibilities included recruiting prospective agents, preparing them to take the insurance test, training them in the basics of selling insurance and servicing customers, and answering any questions the agents might have. A Farmers' district manager, like an agent, is an independent contractor. As a district manager, Vest received a percentage of all premiums generated by the agents in his district.

In addition to training given by their district manager, the agents received a manual, disseminated by Farmers, which stressed the necessity that all insurance applications be filled out truthfully and accurately. The manual instructed them, among other things, on the correct way to fill out an application for insurance. Specifically, Farmers determined that applicants who are not presently insured, or who have allowed prior policies to lapse, constitute a greater insurance risk. Consequently, Farmers' insurance applications contain a section in which an agent is to record the name of the applicant's present insurer and her policy number. If an appli-

cant has no prior insurance or has allowed her prior insurance to lapse, her application is turned down by Farmers, but it will be accepted at a higher premium rate by Farmers high-risk company, Mid–Century Insurance. The significance of that process is that most applicants would rather seek insurance elsewhere than pay the higher Mid–Century premium.

Sometime in 1983, Farmers' underwriters discovered certain discrepancies regarding the applicants' prior insurance information on several applications submitted by Hubbard. The underwriters informed the regional sales manager, who in turn instructed Gary Vest and the division agency manager, Dave Reiten, to conduct an investigation. Vest and Reiten contacted the applicants on whose behalf the applications were submitted. All of the individuals stated that they did not have insurance with any other company at the time they applied through Hubbard for Farmers' coverage, and that they did not represent to Hubbard that they had such insurance. The applications which Hubbard submitted to Farmers on behalf of those applicants, however, indicated the existence of prior insurance and, in fact, provided a prior insurance policy number.

Vest and Reiten reported to the regional sales manager, Dale Hawk, that Hubbard had apparently intentionally misrepresented information on applications. Hawk then reviewed Hubbard's file, wherein he found several reports of instances of professional misconduct by Hubbard. All of the information gathered was then presented to Donald DeWolfe, Farmers' regional manager. He and Hawk then determined that Hubbard must be terminated. Thereafter, Vest and Reiten met with Hubbard and informed him they had evidence of misrepresentations by him, and gave him the opportunity to resign. Hubbard refused to resign but offered no explanation for his conduct. A formal notice of termination was sent to Hubbard and, thereafter, Farmers sent Hubbard's attorney a letter indicating the basis of termination.

Hubbard's Appointment Agreement provided for, in the event of termination, a termination review board hearing as a means for possible reversal of the decision to terminate. The contract provided that the review board was to be made up of three members: one of Farmers' choice, one of the agent's choice, and a neutral member agreeable to both parties. Hubbard formally requested a termination review board hearing. The board consisted of Dale Hawk, representing Farmers, another agent chosen by Hubbard, and a banker selected by the other two members. The board was presented with the applications submitted by Hubbard, the signed statements of the applicants relating that they did not tell Hubbard they had prior insurance, and Hubbard's own testimony. After considering all the information, the board voted two to one to uphold the termination.

Hubbard's Appointment Agreement provided for compensation to the agent if he was terminated for any reason other than embezzlement. The amount represented compensation for the agent's past services and was labeled "contract value." Calculation of "contract value" was according to a formula found in the Appointment Agreement which considered the commissions paid to the agent prior to termination, the number of policies in the agent's portfolio, and her years of service. The "contract value" was to be paid in three installments. Farmers calculated the "contract value" of Hubbard's agency and sent him a check for his first installment. Hubbard refused the check and notified Farmers that all correspondence thereafter was to be through his attorney. Farmers then filed this action for declaratory judgment, seeking a determination of the rights and duties of the parties relative to Hubbard's termination, and an order requiring Hubbard to deliver to Farmers all Farmers' manuals, lists and records in his possession.

### Disposition

Farmers argues, for the first time on appeal, that the trial court judgment should be reversed because the acts of its agent, Gary Vest, cannot be imputed to Farmers under these particular circumstances. Specifically, Farmers contends that, even if

Vest told Hubbard to misrepresent information when filling out applications, that has no bearing on whether Farmers acted in bad faith when it terminated Hubbard, because there is no evidence that Farmers had actual knowledge of Vest's actions, nor could constructive knowledge be imputed to Farmers.

Farmers relies on three general principles of agency law supporting its position that Vest's actions did not represent those of Farmers: (1) "the uncommunicated knowledge of an agent will not be imputed to his principal for the purpose of determining whether the principal acted in bad faith;" (2) "the uncommunicated knowledge of an agent also will not be imputed to his principal when the third person with whom the agent is dealing *knows* that the agent is exceeding his authority;" and (3) "knowledge of the acts of an agent which are in his own interest or in the interest of others and *adverse to those of his principal* will not be imputed to the principal because of the mere existence of the agency." (Brief of Appellant, p. 23). These contentions were not raised or presented to the trial court.

A review of the docket sheet entries demonstrates that our record on appeal is seriously wanting. Those entries designated by Farmers were: Complaint, Answer, Application for Temporary Restraining Order, Order of Preliminary Injunction, Verdict, Reporter's Transcript of Court Instructions, Motion of Farmers for Judgment N.O.V., or in the alternative, for New Trial, Brief in support of the above motions, and Notice of Appeal. Most strikingly absent from both the docket sheets and the record on appeal is any counterclaim of Hubbard's. Furthermore, the record does not contain the Pre–Trial Order. None of the entries certified by appellant Farmers, except the jury verdict, lend any aid in defining the specific triable issues in the case. Nevertheless, the case proceeded to its evidentiary conclusion under circumstances whereby the trial judge expressed his concern about properly instructing the jury on the issues. Prior to closing arguments by counsel to the jury, the following colloquy

occurred in chambers between the court and counsel:

THE COURT: Okay. How did we ever get in the trial of this case anyway?

MR. MORLAN (attorney for Farmers): Well, your Honor, I'll tell you. My company basically—my client basically took the position that they weren't going to pay this dirty jerk a dime.

THE COURT: Well, I didn't mean that. I didn't mean that. I'm sitting on the Bench up there a while ago, worrying about these instructions and some of the ones you submitted. I'm trying to see where there's ever been raised an issue in this case, and I went—tried to go back and find the pleadings, and then I find there's never been a counter claim filed in this case.

MR. MORLAN: He's filed a counter claim.

THE COURT: No, he has not.

MR. MORLAN: I have a counter claim.

MR. STEPH (attorney for Hubbard): Filed it by way of an answer that sets it out in the answer.

THE COURT: You filed an answer, but you never filed a counter claim.

MR. MORLAN: Well, it was my understanding he'd filed one. I received one.

THE COURT: And I go to the pretrial order and the only ones asking for damages is the plaintiff.

MR. MORLAN: Well, that's obviously a typographical error.

THE COURT: Well—the only place in this whole thing that talks about a counter claim is in the pretrial order, and here's the full statement: This is an action for declaratory judgment pursuant to Section 28 U.S.C.—I mean 28 U.S.C., Section 2201, with a counter claim for wrongful termination. And there's never been a counter claim filed.

MR. MORLAN: I have one in my file.

THE COURT: Well, where did you get it.

MR. MORLAN: I got it from him.

\* \* \* \* \* \*

THE COURT: Now, I've got—you handed out the changes and everything (in the

jury instructions). We might as well look them over. I'm going through them one more time and this is the way it's going to be unless you talk me out of it, which is probably going to be very difficult in view of the fact we're trying a phantom case. Don't ever point to the pleadings. They're wrong.

(R., Vol. IV, pp. 502–07).

Notwithstanding the trial court's prodding concern, a counterclaim was never filed with the court. Nonetheless, the "phantom case" proceeded to the jury on the basis of instructions approved by the parties, none of which specifically address the agency issues raised for the first time by Farmers on appeal. Nothing in this record indicates that Farmers submitted instructions to the Court involving the agency issues. Certainly there were no objections to jury instructions made at trial and there are no contentions of error on appeal relative thereto.

The issues and dimensions of the lawsuit were not made known to the trial court by the parties. A properly drawn, detailed pre-trial order is the basis for a trial court's determination of the triable issues and whether certain evidence should or should not be admitted at trial. *Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir.1980). Thus, it serves to narrow the issues, streamline the litigation and prevent surprise. *Lurch v. United States*, 719 F.2d 333, 339 (10th Cir.1983), *cert. denied* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984). The docket sheets in this case reflect that three pre-trial conferences were held between counsel and a United States Magistrate in October, 1986, and that a Pre–Trial Order was filed on November 12, 1986 (R., Vol. I, p. 3). The jury trial was held November 17–20, 1986. *Id.* It would appear that the very busy trial judge did not review the Pre–Trial Order prior to trial, see colloquy, *supra*, but, in any event, the Pre–Trial Order obviously did not define the issues and contours of the lawsuit to the satisfaction of the trial judge. (R., Vol. IV, pp. 502–07). Notwithstanding the trial judge's pointed observation that this was a "phantom case," both parties proceeded to submit the case to the jury on the basis of their closing arguments and instructions submitted by the court, all without objection. One thing is clear: the jury found that Farmers had terminated Hubbard in bad faith and it did so under court instructions, *inter alia*, which placed the burden of proof on Hubbard by a preponderance of the evidence:

The second element—essential element that must be proved by the required degree of proof is bad faith motive by the insurance companies in terminating the agency agreement, and thirdly, damages to the defendant which proximately were caused by the conduct of plaintiff. The burden of proof is upon the defendant to show by a preponderance of the evidence the last two elements, two and three, of his claim for bad faith, element number one having been admitted (the existence of the agency agreement or contract between the parties).

Also the Court instructs you that by the term bad faith is meant intentional misconduct. It involves actual intentions to take unfair advantage, to mislead, to deceive, or to defraud another person.

Now, intent ordinarily may not be proved directly. That's because there is no way of fathoming or scrutinizing the operations of the minds of people. However, you may determine plaintiff's intent from the surrounding circumstances. You may consider such facts and circumstances in evidence which indicate plaintiff's state of mind. It's ordinarily reasonable to determine that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

   \*    \*    \*    \*    \*    \*

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to only the statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seems justified in the light of your experience.

(R., Vol. V, pp. 5–12).

The court carefully instructed that an agent who performs adverse or disloyal to

the insurance company may warrant termination, and that other misconduct of the agent contrary to the terms of the agency agreement may justify termination. *Id.* at p. 569. The jury was also instructed that it may consider both direct evidence and circumstantial evidence in seeking out the "truth of a case." *Id.*

## I.

█ This court will generally not address issues that were not considered and ruled upon by the district court. *Burnette v. Dresser Industries, Inc.,* 849 F.2d 1277 (10th Cir.1988). *See also Graham v. City of Oklahoma City, Okla.,* 859 F.2d 142, 146 n. 6 (10th Cir.1988) ("We will not consider issues which were not raised before the district court."); *Lone Star Steel v. United Mine Workers of America,* 851 F.2d 1239, 1243 (10th Cir.1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory."); *Grasmick v. Otis Elevator Co.,* 817 F.2d 88 (10th Cir.1987) (a plaintiff in a negligence and strict liability action could not raise for the first time on appeal additional negligence theories which were not presented in the trial court.) The narrow exceptions to that general rule relate to issues of jurisdiction in the "case or controversy" limitation of article 3, section 2 of the United States Constitution, *see Citizens Concerned, etc. v. City and County of Denver,* 628 F.2d 1289 (10th Cir.1980), *cert. denied* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981), and questions of sovereign immunity, *see Garcia v. Board of Education of Socorro Consolidated School District,* 777 F.2d 1403 (10th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986). Those exceptions do not apply in this case.

Our review of the record shows that the issues raised by Farmers on appeal were not adequately raised, preserved or presented by Farmers to the district court. Thus, by its own failures or inactions at trial, Farmers rendered it inappropriate for us to consider the above theories of relief on appeal. *See Bradford v. U.S. ex rel. Department of Interior, etc.,* 651 F.2d 700, 704–05 (10th Cir.1981). Farmers did not address any agency arguments to the jury, nor did it request any instructions of the court relative thereto. Furthermore, Farmers did not request special interrogatories addressing the issue for jury determination. Hubbard, however, did introduce evidence and argued to the jury that Farmers had placed Vest in a position of authority upon which agents such as Hubbard could rely and that, inferentially, there was a holding out by Farmers that Vest spoke for Farmers when he related to Hubbard and other agents that falsification of an applicant's past insurance ownership was permissible. Farmers did not object to Hubbard's argument or to the jury instructions. We cannot permit Farmers to raise the issues of Vest's questionable authority for the first time on appeal. To do so would be to condone an endless pursuit of litigation. It was incumbent upon Farmers to raise all theories, arguments, and issues at the trial level.

## II.

█ In reviewing a judgment notwithstanding the verdict, we are guided by the principle that such denial is "error only when the evidence points but one way and is susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made." *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988). We cannot "weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment for that of the jury." *Brown v. McGraw–Edison Co.,* 736 F.2d 609, 613 (10th Cir.1984). After reviewing the record in this case, we conclude that there was sufficient evidence from which the jury could have found that Vest had misled Hubbard, and that Vest's actions were those of Farmers. That is apparently what the jury determined in finding that Farmers exercised bad faith in terminating Hubbard. Although the jury was not guided in that determination under the instructions, which were submitted without objection, the jury resolved the credibility disputes against Farmers and in favor of Hubbard. There was evidence

upon which the jury could have reasonably inferred that Vest's representations to Hubbard were the representations of Farmers. Thus, we decline to disturb the district court's order denying Farmers' motion for judgment notwithstanding the verdict.

Our review of a denial of a motion for a new trial focuses on whether the "verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence" when the challenge is to the weight of the evidence, as here. *Champion Home Builders v. Shumate*, 388 F.2d 806, 808 (10th Cir.1967). We cannot disturb the denial of a motion for new trial unless there is a showing of a manifest abuse of discretion. *Brown v. McGraw–Edison Co.*, 736 F.2d at 616. No abuse of discretion has been demonstrated here.

We also hold that there was ample evidence presented upon which the jury could have based its damage award.

We AFFIRM.